**TERESA T. and Zazsheen P., minor children and Matthew T. Gilbride, Esq., PPA, Plaintiffs,**

v.

**Kristine D. RAGAGLIA, et al., Defendants.**

**No. CIV.3:00CV1190(AVC).**

United States District Court, D. Connecticut.

July 16, 2001.

Raymond J. Rigat, Clinton, CT, for Plaintiffs.

Benjamin Zivyon, Atty. Gen. Office, Hartford,CT, for Defendants.

### *RULING ON THE DEFENDANTS' MOTIONS TO SUBSTITUTE AND TO DISMISS*

COVELLO, Chief Judge.

This is an action for compensatory and punitive damages stemming from the fatal beating of an eight-month old baby that was witnessed by the two plaintiffs, Teresa

T. and Zazsheen P. It is brought pursuant to 42 U.S.C. § 1983;[1] article first, sections eight, nine and ten of the Connecticut constitution,[2] and Conn. Gen.Stat. § 17a–101g.[3] The plaintiffs, minor children who are presently in foster care in Connecticut, bring this action by their next of friend, Matthew T. Gilbride, an attorney licensed in Connecticut.

The nine-count amended complaint alleges that the defendants, Mary Ellen Tatten, Kenneth Mysogland, Joann Perry, Kenneth Armstrong and Marilyn Ortiz, (the "DCF defendants"), in their individual capacities, violated the plaintiffs' rights to due process and equal protection. The complaint alleges that the DCF defendants failed to seek an order of temporary custody when the plaintiffs were being abused by their father. In addition, the complaint alleges that the defendants, Dr. Robert Windom and the Hill Health Center, negligently and with deliberate indifference, failed to report the suspected child abuse of the plaintiff, Teresa T., pursuant to Connecticut statutory law.

The defendants, Windom and the Hill Health Center, bring the within motion for substitution of the United States of America for them as a defendant in this matter,

and to dismiss the action against the United States pursuant to the Federally Supported Health Care Center Assistance Act, 42 U.S.C. § 233, and Fed.R.Civ.P. 12(b)(1). The DCF defendants bring the within motion to dismiss the action against them pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a cause of action.

The issues presented are: (1) whether the United States may be substituted as a defendant in this action pursuant to the Federally Supported Health Care Center Assistance Act; (2) whether the application of the Federally Supported Health Care Center Assistance Act in this case violates the Tenth Amendment; (3) whether the action against the substituted-defendant United States should be dismissed for failure of the plaintiffs to exhaust their administrative remedies; (4) whether the plaintiffs may assert a cause of action for the violation of their procedural due process rights caused by the defendants' failure to act under the Connecticut child protection statutes; and (5) whether the physical abuse of the plaintiffs by a parent constitutes slavery under the Thirteenth Amendment.

For the reasons that follow, the court concludes that: (1) the United States

1. Title 42 of the United States Code, section 1983, provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

2. Article first, section eight of the constitution of Connecticut provides in pertinent part that "[n]o personal shall be . . . deprived of life, liberty or property without due process of law . . . ." Article first, section nine of the constitution states: "No person shall be arrested, detained or punished, except in cases clearly

warranted by law." Article first, section ten provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

3. Conn. Gen.Stat. § 17a–101g contains the procedures that the commissioner of children and families must follow upon receiving a report of child abuse. Subsection (c) provides: "If the Commissioner of Children and Families, or his designee, has probable cause to believe that the child or any other child in the household is in imminent risk of physical harm . . . the commissioner, or his designee, shall authorize any employee . . . to remove the child . . . ."

should be substituted as a defendant in this action under the provisions of the Federally Supported Health Care Center Assistance Act; (2) application of the Federally Supported Health Care Center Assistance Act in this case does not violate the Tenth Amendment; (3) the action against the substituted-defendant United States should be dismissed without prejudice for failure to exhaust administrative remedies; (4) the plaintiffs cannot bring a cause of action for violation of their procedural due process rights caused by the defendants' failure to report and investigate child abuse pursuant to Connecticut statutory law; and (5) the physical abuse of the plaintiffs by a parent is not a form of slavery or involuntary servitude under the Thirteenth Amendment.

Therefore, the motion of the defendants, Windom and the Hill Health Center, to substitute the United States as a defendant for them (document no. 34) is granted. The substituted-defendant United States' motion to dismiss the plaintiffs' action against it (document no. 34) is granted without prejudice to the plaintiffs' filing of an administrative action. The DCF defendants' motion to dismiss the complaint is granted to the extent that the complaint alleges violations of due process, and the fifth cause of action is dismissed in its entirety.

## FACTS

■ Examination of the amended complaint and supporting papers[4] discloses the following relevant facts:

On October 24, 1996, one Annette Pompano, a nurse at the ACES school, contacted the department of children and families ("DCF") about a child, Teresa T. Teresa, who was twelve-years-old at that time, has autism and is nonverbal. Theresa T. had come to school that day with marks on her neck and had recently lost weight. That same afternoon, the defendant, Marilyn Ortiz, a DCF investigation worker, inspected the marks on Teresa's neck. She believed that the marks were old and noted that Teresa appeared very thin. Ortiz determined that Teresa T. and her family were in immediate need of DCF treatment services.

Ortiz and the defendant, Kenneth Armstrong, a DCF social worker trainee, visited Teresa's mother, Ms. G. Ms. G. denied that any of her three children were being abused. Ortiz attempted to complete a domestic violence and drug assessment of the family, but found Ms. G. to be evasive and uncooperative. Ms. G. refused to give any information regarding her children's fathers or to answer substance abuse screening questions.

On October 25, 1996, Ortiz spoke to one Tina Acompora, Theresa T.'s teacher, who reported that Teresa T. had been her student for approximately two years. Acompora reported that the marks on Teresa's neck that appeared on October 24th had not been there the day before. Acompora stated that Teresa came to school every day, was not a picky eater, and did not routinely scratch herself.

That same day, Ortiz spoke to Pompano, the school nurse, who confirmed that the marks on Teresa T.'s neck had not been there the day before. Pompano reported that the bruises were "pressure marks"

---

4. On a motion to dismiss for lack of subject matter jurisdiction, the court may resolve disputed factual issues by reference to evidence outside the pleadings, such as affidavits *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir.1998). The defendants have submitted the affidavits of William A. Collier, an Assistant United States Attorney, and a "Certification of Scope of Employment," made pursuant to 42 U.S.C. § 233(c), by John B. Hughes, an Assistant United States Attorney.

and not scratches, which is why they may have looked old. The school nurse stated that as of her last physical in September 1995, Teresa T. was in the last 25 percentile with respect to her weight, but when she returned from summer vacation, she was in the last 10 percentile for weight. Pompano stated that Teresa ate breakfast, lunch and snacks at the school, and that the school sent food home with her.

On November 6, 1996, Teresa T.'s case was assigned to Armstrong. On November 15, 1996, Armstrong made an announced visit to Ms. G.'s residence. Ms. G. told Armstrong that her husband, Joseph P., lived at the home occasionally, but would not answer any questions about him. Ms. G. reported to Armstrong that there was no domestic violence occurring in her home.

On November 25, 1996, Armstrong visited Ms. G.'s home to meet with Joseph P. Joseph P., however, was not there and was reportedly in court. Ms. G. would not give Armstrong information on how to directly contact Joseph P. Armstrong told Ms. G. that he would make weekly visits to the home on Mondays at 4:00 p.m.

That same day, Armstrong visited Teresa T. and her teacher, Acompora, at the ACES school. Acompora had Teresa lift her pant leg to show Armstrong how thin her leg was. Acompora described Teresa T. as "always shoving her food in her mouth eating as if she thinks that someone might take the food away from her before she is finished." Acompora told Armstrong that the school fed Teresa T. double portions for breakfast and lunch. In addition, Acompora stated she was concerned that Teresa T. was losing her hair, that she came to school with body odor, and that she wore unclean undergarments which were not being changed. Acompora explained that the school sent home donated clothes with Teresa, but that Teresa did not wear them to school. Acompora expressed concerns about Teresa T. not starting her menstrual cycle and her being in need of a physical. Acompora further stated that the school was concerned about Joseph P. being in Ms. G.'s home because he had asked the school bus driver for money on several occasions.

On November 27, 1996, Ms. G. was evaluated for substance abuse at the APT Foundation in New Haven, Connecticut. The drug counselor, one Elaine Fagan, recommended that Ms. G. be evaluated psychologically and that she undergo hair follicle testing to assess possible substance abuse. Fagan asked to speak with Armstrong following her interview with Ms. G., but was told by Armstrong that he had a "hot" case on his hands. Fagan told Armstrong that Ms. G. was very angry during the interview and that she was concerned that there were other issues aside from drugs that were causing Ms. G's problems.

On December 3, 1996, Armstrong contacted one Edna Brown, an employee of the department of mental retardation, and learned that she had worked with Teresa T.'s family for approximately one year. On December 9, 1996, Armstrong went to Ms. G's house to meet with Ms. G., Joseph P. and Brown. Armstrong arrived to find a belligerent Joseph P. who was then loud and disruptive during the conversation.

On December 16, 1996, Armstrong received a call from Acompora at the ACES school. Acompora stated she was concerned about Teresa T.'s weight loss because she had lost an additional 6½ pounds since returning from Thanksgiving break. Later that afternoon, Armstrong made an unannounced visit to Ms. G.'s home. He checked the refrigerator and observed food in the home, but was unable to confirm that Ms. G. was actually feeding Teresa T. Armstrong observed that Ms. G.'s

youngest child, Shedina P., wore a shirt that was damp with urine.

On December 20, 1996, Teresa T. received a full medical examination by the defendant, Dr. Windom, of the Hill Health Center in New Haven, Connecticut. The Hill Health Center is a community health center which receives federal assistance. On December 30, 1996, Armstrong contacted Windom, who reported that Teresa T. was in "good physical condition," and that he had "no concerns regarding her health or weight loss." Armstrong, however, did not credit Windom's conclusions. Armstrong told the doctor about the marks to Teresa's neck and that the ACES school had documented a pattern of Teresa losing weight over long weekends and school vacations. Armstrong further explained that Teresa ate double portions of breakfast and lunch at the ACES school, and was observed eating frantically. Armstrong also spoke with one Steven Updegrove, a social worker at the Hill Health Center, who told Armstrong that the systematic starvation of Teresa T. "was obvious from her health care records and to any concerned medical care provider." The ACES school asked that Teresa T. be seen by another physician.

In January of 1997, Armstrong arranged to have respite services provided at Ms. G.'s home through the Benhaven agency. The Benhaven agency's program coordinator, one Tacie Lowe, told Armstrong that the family required more intensive services than those Benhaven could provide. Lowe had visited the home with Armstrong and noticed a peculiar odor there and that there was no light in the apartment. Lowe terminated Benhaven's services to the family when one of the agency's service providers reported that Joseph P. had called her at home and asked her for sexual favors. In addition, the service provider told Lowe that the house smelled of urine, was unclean and was unsafe. Lowe again informed Armstrong that the family required more intensive services, to which Armstrong replied that he had closed the file.

Throughout most of the DCF involvement with Ms. G.'s family, the DCF and Ms. G. had a written service agreement. Ms. G. failed to perform the expectations that were required of her under the agreement. Nonetheless, DCF chose to close the case.

On January 26, 1997, eight-month-old Shedina P., Teresa T.'s sibling, arrived at the emergency room with severe head trauma and several rib fractures. The emergency room physician, Dr. Clifford Bogue, confirmed that the injuries were consistent with child abuse. The DCF then took a 96 hour hold on Shedina's siblings, Theresa T. and Zazsheen P., due to the assessment of imminent risk. On January 29, 1997, Shedina died of her injuries.

On February 4, 1997, Armstrong called Ms. G. who told him that Joseph P. was responsible for the baby's injuries. Ms. G. reported that Joseph P. began abusing Shedina P. when she was three-months-old. Ms. G. explained that Joseph P. would "coach" her on how to answer the social workers' questions, and that she did not report the abuse out of fear for her own life. Ms. G. told Armstrong that Joseph P. had inflicted the bruises on Teresa T.'s neck and had abused all three children on numerous other occasions. On February 5, 1997, Ms. G. told Armstrong that Teresa T. and Zazsheen P. had both witnessed Joseph P.'s beating of Shedina which ultimately led to the baby's death.

On June 26, 2000, the plaintiffs commenced this action through their next of friend. The first five causes of action are directed against the following DCF defendants, all in their individual capacities:

Mary Ellen Tatten, the regional director of the New Haven division of DCF; Kenneth Mysogland, the program supervisor; Joann Perry, the social work supervisor; Kenneth Armstrong, the treatment social worker; and Marilyn Ortiz, the investigative worker. The five causes of action allege that the DCF defendants violated the plaintiffs' rights under the First, Fourth, Fifth, Eight, Thirteenth and Fourteenth Amendments to the United States Constitution and article first, sections eight, nine and ten of the constitution of the state of Connecticut. Specifically, the plaintiffs argue that the defendants failed to act appropriately to protect them from the abuse going on in their home of which the defendants knew or should have known about.

The complaint's sixth, seventh, eighth and ninth causes of action allege that the defendants, Dr. Robert Windom and the Hill Health Center, negligently and with deliberate indifference, failed to report the child abuse suffered by Teresa T. to the state authorities, as required under Connecticut statutory law.

## I. MOTION TO SUBSTITUTE AND MOTION TO DISMISS

The defendants, Dr. Robert Windom and the Hill Health Center first bring the within motion to substitute the United States as a defendant for them, and to dismiss the action pursuant to Fed. R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction over the substituted-defendant, the United States.

### STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) must be granted if a plaintiff has failed to establish subject matter jurisdiction *Golden Hill Paugussett Tribe of Indians v. Weicker*, 839 F.Supp. 130, 136 (D.Conn.1993). In analyzing a motion to dismiss under Rule

12(b)(1), the court must accept all well pleaded factual allegations as true and must draw reasonable inferences in favor of the plaintiff. *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir.1993). Where a defendant challenges the district court's subject matter jurisdiction, the court may resolve disputed factual issues by reference to evidence outside the pleadings, such as affidavits. *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir.1998).

### DISCUSSION

The defendants, Dr. Robert Windom and Hill Health Center, first move to substitute the United States for them as a defendant in this matter. Specifically, the defendants argue that under the Federally Supported Health Care Center Assistance Act ("FSHCAA"), 42 U.S.C. § 233, the Hill Health Center and its employees are considered employees of the federal Public Health Service and are immune in civil actions. The defendants argue that, pursuant to the FSHCAA, "a plaintiff's remedy for alleged negligence by deemed health centers and their employees shall lie against the United States only ...."

In response, the plaintiffs first argue that the FSHCAA does not "protect the named defendants from their own acts when done with deliberate indifference." Specifically, the plaintiffs argue that the sixth and seventh causes of action allege that Windom and Hill Health Center acted with "deliberate indifference" because they were obligated to report suspected abuse under Connecticut statutory law. Next, the plaintiffs argue that "[t]he FSHCAA affords the defendants' protections for medical negligence, but does not protect them from their per se negligence by not reporting the child abuse and neglect suffered by Teresa T." Specifically, the plaintiffs argue that the sixth, seventh, eighth

and ninth causes of action allege that the defendants failed to act under a statutory duty imposed by Connecticut law, for which the FSHCAA does not provide immunity. Finally, the plaintiffs argue that the application of the FSHCAA in the instant case "is an attempt to regulate the law of child protection within the State of Connecticut and as such, would violate the Tenth Amendment to the United States Constitution."

### The FSHCAA

The FSHCAA, 42 U.S.C. § 233(g), states that eligible community health centers and their employees are employees of the Public Health Service for certain purposes. The secretary of health and human services deems a community health center a Public Health Service employee after the center has qualified for certain federal financial assistance *See* 42 U.S.C. § 233(g)(1)(D) to (G). Once deemed Public Health Service employees, a community health center and its employees enjoy immunity for their acts which relate to their employment, and any actions against them are treated as actions against the United States. 42 U.S.C. § 233(a). Section 233(a) of the FSHCAA provides:

> The remedy against the United States provided by [the Federal Tort Claims Act] ... for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions ... by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee ... whose act or omission gave rise to the claim.

42 U.S.C. § 233(a). This section "makes the Federal Tort Claims Act the exclusive remedy for specified actions against mem-

bers of the Public Health Service," *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir. 2000), and protects "employees of the Public Health Service from being subject to suit while performing medical and similar functions by requiring that such lawsuits be brought against the United States instead." *Id.* at 108.

In *Cuoco v. Moritsugu*, 222 F.3d 99 (2d Cir.2000), the second circuit concluded that the immunity provided to Public Health Service employees is not absolute: "If [the plaintiff] alleged and could prove that [the defendants] violated her constitutional rights in the course of something other than the performance of a medical or related function, or while acting outside the scope of [their] employment, § 233(a) would not, of course, provide that defendant with absolute immunity." *Id.* at 109. Thus, the issue for the court is to determine "whether the injury for which [the plaintiff] seeks compensation was one 'resulting from the performance of medical ... or related functions' by [the defendants] while acting within the scope of their offices or employment." *Id.* at 107 (quoting 42 U.S.C. § 233(a)).

Here, the secretary of health and human services deemed the Hill Health Center a Public Health Service employee for purposes of the FSHCAA on November 19, 1994. As part of their motion, the defendants have included a certification of scope of employment, signed by the assistant United States attorney, which states that both defendants are eligible for coverage under the FSHCAA because they are considered employees of the Public Health Service.

### Deliberate Indifference and Per Se Negligence

In response, the plaintiffs first argue that "eligible community health centers receiving federal funds are federal employees and, together with their employees,

are immune from claims of *negligence* if they were acting within the scope of their employment." The plaintiffs argue that the sixth and seventh causes of action of the complaint assert claims of deliberate indifference against the defendants. In addition, the plaintiffs argue that the sixth, seventh, eighth and ninth causes of action assert per se negligence for failing to report suspected child abuse pursuant to Connecticut statutory law. Specifically, the plaintiffs argue that the FSHCAA provides immunity for medical malpractice only, and that "they are asserting damages as a result of the [defendants'] failure to make a statutorily required report of child abuse."

█ There is nothing in the FSHCAA which limits the defendants' liability to actions in negligence only. Section 233(a) states that its remedy against the United States "for damage for personal injury, including death, resulting from the performance of medical ... or related functions ... shall be exclusive of any other civil action or proceeding ...." Nothing in the statute suggests that the immunity it provides is limited to negligence actions only. The second circuit concluded in *Cuoco v. Moritsugu*, 222 F.3d 99 (2d Cir.2000), that the defendants, a doctor and a prison medical director, were entitled to immunity under § 233(a) where the plaintiff alleged that she had a serious medical condition that the defendants treated with "deliberate indifference." *Id.* at 106–7.

█ The plaintiffs argue that the FSHCAA does not apply to the defendants because their statutory duty to report suspected abuse was "independent of any duty as a physician and health care provider." Indeed, the immunity provided by § 233(a) would not apply to the defendants if the plaintiffs "alleged and could prove that either of these defendants violated [their rights] in the course of something

other than the performance of a medical or related function or while acting outside the scope of his employment ...." *Cuoco v. Moritsugu*, 222 F.3d 99, 109 (2d Cir.2000). The issue for this court to determine is whether the injury for which the plaintiffs seek compensation resulted from the defendants' performance of medical or related functions within the scope of their employment. *See id.* at 107.

█ Conn. Gen.Stat. § 17a–101a requires that a mandated reporter, as defined in Conn. Gen.Stat. § 17a–101, "who in his professional capacity has reasonable cause to suspect or believe that any child ... has been abused ... shall report or cause a report to be made ...." This section provides that anyone failing to make such a report "shall be fined not more than five hundred dollars." The list of mandated reporters under the statute includes licensed physicians, surgeons, nurses, dentists, psychologists, school teachers, social workers, police officers and clergymen. C.G.S. § 17a–101(b). The defendants correctly note that the defendant, Hill Health Center, is not a mandated reporter under the statute, but agree that the defendant, Windom, is a mandated reporter.

█ The plaintiffs argue that Windom's duty to report the suspected abuse of Teresa T. was not a "medical function," but a statutory duty imposed on certain members of the community and not "restricted to medical professionals." Therefore, the plaintiffs argue, the FSHCAA's immunity does not apply to Windom because his alleged conduct was not related to his practice of medicine. However, as explained above, the immunity provided to employees of the Public Health Service is not limited to claims for medical malpractice. The immunity extends to claims related to "the performance of a medical,

300

surgical, dental, *or related functions,*" against those employees acting within the scope of their employment. 42 U.S.C. § 233(a)(emphasis added). *See also Cuoco v. Moritsugu,* 222 F.3d 99, 108 (2d Cir. 2000) (Holding there is "nothing in the language of § 233(a)" to support the conclusion that it "provides immunity only from medical malpractice claims.").

█ The statutory duty to report suspected child abuse imposed on Connecticut doctors, while extending to other community professionals, is imposed on doctors acting in their "professional capacity." C.G.S. § 17a–101a. The obligation to report is required of doctors when they act as doctors, not when they are acting as private persons. The duty to report is therefore a "related function" to the doctor's performance of medical services, because it adds a required element to the doctor's evaluation of his patient. Windom's duty to report any suspected abuse of Teresa T. was triggered when he performed a medical examination of Teresa. The statutory obligation clearly occurred within the scope of Windom's employment because Windom was examining Teresa T. as a patient referred to him by DCF. The FSHCAA, therefore, provides immunity to Windom vis a vis his statutory obligation because the duty is inextricably woven into his performance of medical functions.

### The Tenth Amendment

█ The plaintiffs finally argue that application of the FSHCAA in the present case would be "an attempt to regulate the law of child protection within the State of Connecticut," and would violate the Tenth Amendment. Specifically, the plaintiffs argue that the protection of children is a uniquely state interest and that application of the FSHCAA would "subvert[ ] the will of the [Connecticut] legislature which has unequivocally determined to impose sanc-

tions against individuals who fail to report child abuse .... " In response, the defendants argue that the plaintiffs have not met their burden of showing that the federal statute infringes in any way upon the Tenth Amendment.

The plaintiffs' argument is unpersuasive. The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." On its face, the FSHCAA does not regulate within the state's province of child protection. Application of the federal statute in this case in no way nullifies or infringes upon the duty of certain professionals in Connecticut to report suspected child abuse pursuant to Conn. Gen.Stat. § 17a–101a. Mandated reporters, like the defendant, Windom, are still subject to the penalty of a fine imposed by the section for failing to report. The plaintiffs have not demonstrated how substitution of the United States for the defendants violates the Tenth Amendment or impedes Connecticut's ability to regulate its own child protection laws.

The plaintiffs' exclusive remedy for the alleged injuries caused by the defendants, the Hill Health Center and Windom, is an therefore an action against the United States under the Federal Tort Claims Act. The United States shall thus be substituted as a party for these defendants.

### Motion to Dismiss

The substituted-defendant, the United States, argues that the plaintiffs' causes of action against it must be dismissed for lack of subject matter jurisdiction. Specifically, the United States argues that the plaintiffs failed to exhaust their administrative remedies under the Federal Tort Claims Act. In response, the plaintiffs argue that any dismissal of their causes of action should be without prejudice to allow the plaintiffs to file an administrative claim.

▉ The Federal Tort Claims Act, 28 U.S.C. § 2675(a) provides that "[a]n action shall not be instituted upon a claim against the United States for money damages for injury ... unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing ...." "[B]ecause the FTCA constitutes a waiver of sovereign immunity, the procedures set forth in Section 2675 must be adhered to strictly." *Keene Corp. v. United States*, 700 F.2d 836, 841 (2d Cir.1983). "Thus failure to file claims for tort damages with the appropriate agency precludes this court from exercising jurisdiction over those claims." *Setlech v. United States*, 816 F.Supp. 161, 165 (E.D.N.Y.1993).

The plaintiffs do not dispute that they have not filed a claim for damages with a federal agency for their injuries. Accordingly, their action against the United States must be dismissed. The United States concedes that the dismissal should be without prejudice to the filing of an administrative appeal but argues that such a filing will be untimely. This court need not address the merits of the government's argument, as such an issue may be more appropriately raised before the federal agency itself.

The plaintiffs' causes of action against the United States (actions six through nine of the complaint) are therefore dismissed without prejudice to the plaintiffs' filing of an administrative claim for their alleged injuries.

## II. MOTION TO DISMISS FOR FAILURE TO STATE A CAUSE OF ACTION

The defendants, Mary Ellen Tatten, Kenneth Mysogland, Joann Perry, Kenneth Armstrong and Marilyn Ortiz (the "DCF defendants") move to dismiss the case pursuant to Fed.R.Civ.P. 12(b)(6), arguing that the complaint fails to state a cause of action upon which relief can be granted.

## STANDARD

A motion to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure "merely ... assess[es] the legal feasibility of the complaint, [it does] not ... assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984). When ruling on a motion to dismiss, the court must presume that the well-pleaded facts alleged in the complaint are true and draw all reasonable inferences from those facts in favor of the plaintiff. *See Sykes v. James*, 13 F.3d 515, 519 (2d Cir.1993). A court may dismiss a complaint at this stage only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim." *Conley v. Gibson*, 355 U.S. 41, 45–6, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## DISCUSSION

The DCF defendants move to dismiss the case against them, arguing that the plaintiffs have "failed to establish that the DCF defendants' action gives rise to a claim under § 1983." Specifically, the defendants argue that "even if their alleged conduct as stated in the Amended Complaint is assumed to be true, they violated no constitutional[ly] protected rights." The defendants argue that the Supreme Court, in *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), expressly held that the Due Process Clause does not require a state to protect its citizens from violence inflicted by private actors.

In response, the plaintiffs argue that *DeShaney* is not applicable to this case,

because *DeShaney* addressed only substantive due process, and here the plaintiffs allege violations of their procedural due process rights. The plaintiffs argue that the Connecticut child protection statutes give them a property interest in their protection from parental abuse. In addition, the plaintiffs argue that the fifth cause of action should not be dismissed because the DCF defendants violated the plaintiffs' Thirteenth Amendment rights to be free from conditions of slavery and peonage.

### DeShaney

The DCF defendants argue that the facts of this case are similar to the facts in the Supreme Court's decision, *DeShaney v. Winnebago County Dep't. of Soc. Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), and the case should therefore be dismissed. In *DeShaney*, the Court held that the "State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 196, 109 S.Ct. 998.

The Court explained that the facts of the *DeShaney* case were "undeniably tragic." *Id.* at 191, 109 S.Ct. 998. Wisconsin state and county officials had received numerous reports that the plaintiff, Joshua DeShaney, then four-years-old, was being abused by his father. Despite investigation into the suspected abuse, no steps were taken to remove Joshua from his father's care. Joshua's father eventually beat the four year old so severely as to leave him profoundly retarded for life. *Id.* Joshua and his mother then brought suit against the local and state officials, arguing that they had deprived Joshua of his liberty interest in freedom from intrusion on his personal security. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195, 109 S.Ct. 998 (1989).

The Supreme Court concluded that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195, 109 S.Ct. 998. The Court explained that the Due Process Clause is a limit only on the State's power to act, and not a guarantee of minimal security. *Id.* at 195, 109 S.Ct. 998.

In *DeShaney*, the Court addressed only substantive due process, finding that the plaintiffs had failed to timely raise their procedural due process arguments. The Court expressly declined to consider whether Joshua had a entitlement to receive the protective services provided by state law to warrant procedural due process protection. *Id.* at 195, n. 2, 109 S.Ct. 998.

There are two exceptions to the *DeShaney* doctrine. The first is the "special relationship" exception and applies in "certain limited circumstances," where a state has the duty to protect an individual against others: "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 199–200, 109 S.Ct. 998. The second exception is known as the "state created danger exception." Under this exception, a cause of action against the state for violence inflicted by a private individual is not barred if state actors played a part in the creation of the danger. *See, e.g., Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir.1993) (Holding that the defendants, city policemen, violated the due process rights of the plaintiff where the police conspired with private actors to allow them to beat up the plaintiff without the threat of arrest).

In the instant case, to the extent that the complaint alleged violations of the

plaintiffs' substantive due process rights,[5] such claims must be dismissed under *De-Shaney*. The Supreme Court has specifically concluded that a "State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The plaintiffs' argument that the DCF defendants had a role in creating the violence committed against the plaintiffs is unpersuasive. The "state created danger" exception to *DeShaney* applies only in those cases where the defendants "had assisted in creating or increasing the danger to the victim ...." *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir.1993). Here, it is uncontroverted that Joseph P. committed the violence against the plaintiffs and their sibling, Shedina. The complaint does not allege that the DCF defendants in any way created the danger to the plaintiffs. Rather, the complaint alleges that the DCF defendants failed to act in protecting the plaintiffs from the violence inflicted upon the by Joseph P., a cause of action prohibited by *DeShaney*.

### Procedural Due Process Claims Under DeShaney

■ The plaintiffs concede that if their claims were based "solely upon the Federal Due Process Clause, *DeShaney*, ... might indeed bar their claims as the defendants argue ...." The plaintiffs argue, however, that Connecticut's child protection statutes create a property interest which requires procedural due process protection. In response, the DCF defendants argue that no cases following *De-Shaney* have recognized a claim of entitlement based on child protection legislation.

"In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property,' is not itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of the law.*" *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). "It is well settled that only a limited range of interests fall within this provision." *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *DeShaney*, the Supreme Court expressly rejected the idea that substantive due process "requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *De-Shaney*, 489 U.S. 189, 195, 109 S.Ct. 998 (1989). The Court, however, left open what a state's obligations are under procedural due process by declining to consider the petitioner's argument that Wisconsin's child protection statutes "gave [the plaintiff] an 'entitlement' to receive protective services in accordance with the terms of the statute ...." *Id.* at 195, n. 2, 109 S.Ct. 998.

The seventh circuit held in *Doe v. Milwaukee County*, 903 F.2d 499 (7th Cir. 1990), that a plaintiff did not have a protected interest in the state's child protection statutes so as to trigger the Due Process Clause. The court explained that not every state statute creates a protected entitlement, and that "[o]ne cannot have a 'property interest' (or a life or liberty interest, for that matter) in mere procedures because [p]rocess is not an end itself." *Id.* at 502–03 (quoting *Olim v. Wakinekona*, 461 U.S. 238, 250, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983)). The seventh circuit

---

**5.** Counts one, two and three of the complaint each contain, *inter alia,* allegations that the plaintiffs' substantive due process rights were violated by the inaction of the DCF defendants.

concluded that the Wisconsin statutes created a set of procedures which "assist the county in conferring the benefit of government protection upon Wisconsin's minor residents[,]" but concluded that the state procedures were not themselves protected interests under the Fourteenth Amendment. *Id.* at 503. The court noted that:

> [I]t seems to us, the provision for investigation of required reports is designed to strike a balance between the state's interest in protecting children and individual families' interest in privacy from state intrusions. Thus, the statute can be seen as establishing a procedure by which the state may deprive a family of its liberty interest in privacy.

*Doe v. Milwaukee County*, 903 F.2d 499, 504 n. 9 (7th Cir.1990). The court affirmed the district court's dismissal of the action for failure to state a federal claim. *Id.* at 505.

█ Similarly, in *Doe v. District of Columbia*, 93 F.3d 861 (D.C.Cir.1996), the District of Columbia circuit held that a minor could not sue government employees for violations of procedural due process where the defendants allegedly failed to investigate reports of child abuse. The court acknowledged that "state law which generates a legitimate claim of entitlement can create an interest the deprivation of which triggers application of the Due Process Clause." *Id.* at 868. However, the court held, in enacting the child protection procedures, "D.C. has not assumed a constitutional obligation to protect children

from such abuse and neglect." *Id.* Like the seventh circuit held in *Doe v. Milwaukee County*, the District of Columbia circuit concluded that "state-created *procedures* do not create such an entitlement where none would otherwise exist." *Doe v. District of Columbia*, 93 F.3d 861, 868 (D.C.Cir.1996).

In the instant case, the plaintiffs do not argue that the state of Connecticut had the constitutional obligation to enact its child protection statutes, but rather, they argue that the Connecticut child protection statutes "create a property interest in their provisions[.]" The plaintiffs' framing of their argument makes clear that the procedural rights they seek to enforce stem not from a constitutional source, but rather from Connecticut's state-created procedures. Procedures alone, however, do not demonstrate a legitimate claim of entitlement. The *DeShaney* court concluded that the states were under no obligation to protect children from the abuse of private actors. It would be inapposite to conclude that Connecticut's child protection statutes, and the procedures contained within, trigger procedural due process rights. "The State may choose to require procedures for reasons other than the protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right." *Olim v. Wakinekona*, 461 U.S. 238, 250–51, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983).[6]

---

**6.** To support their argument that the Connecticut child protection statutes create an entitlement for purposes of procedural due process, the plaintiffs cite the fifth circuit's decision in *Chrissy F. v. Mississippi Dep't of Pub. Welfare*, 925 F.2d 844 (5th Cir.1991). In that case, an eight-year-old brought an action for damages against several state and local officials for their alleged failure to investigate abuse by the plaintiff's father. *Id.* at 845. The district court denied the defendants' motion to dismiss for failure to state a claim and for qualified immunity. On appeal, the fifth circuit affirmed the denial of qualified immunity, but did not address whether the plaintiff's claims for violations of her procedural due process stated viable cause of action: "The district court did not rule on the due-process claims, and there is no Fifth Circuit authority directly on them, and the parties have not fully briefed them on appeal. We therefore intimate no opinion at this time with regard to their mer-

Based on the foregoing, the court concludes that the plaintiffs' causes of action based on violations of substantive and procedural due process must be dismissed for failure to state a cause of action.

### Thirteenth Amendment

The plaintiffs finally argue that their fifth cause of action should not be dismissed because it states a cause of action under the Thirteenth Amendment. Specifically, the plaintiffs argue that children who are abused suffer in slavery-like conditions. The plaintiffs argue that it is the state's responsibility to prohibit such slavery and that "the state must enact and actively enforce child abuse laws within its jurisdiction."

The Thirteenth Amendment to the United States Constitution provides: "Neither slavery nor involuntary servitude . . . shall exist within the United States . . . ." In *United States v. Kozminski*, 487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988), the Supreme Court concluded:

> The primary purpose of the Amendment was to abolish the institution of African slavery as it had existed in the United States at the time of the Civil War, but the Amendment was not limited to that purpose; the phrase 'involuntary servitude' was intended to extend 'to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results.'

*Id.* at 942, 108 S.Ct. 2751 (quoting *Butler v. Perry*, 240 U.S. 328, 332, 36 S.Ct. 258, 60 L.Ed. 672 (1916)). The Supreme Court went on to say that "our precedents clearly define a Thirteenth Amendment prohibition of involuntary servitude enforced by the use or threatened use of physical or legal coercion." *Kozminski*, 487 U.S. at 944, 108 S.Ct. 2751.

In *Robertson v. Baldwin*, 165 U.S. 275, 17 S.Ct. 326, 41 L.Ed. 715 (1897), the Supreme Court, in dicta, stated that the Thirteenth Amendment "was not intended to introduce any novel doctrine with respect to certain descriptions of services which have always been treated as exception [.]" Specifically, the Court concluded that the Amendment was not intended "to disturb the right of parents and guardians to the custody of their minor children or wards . . . We know of no better answer to make then to say that services which have from time immemorial been treated as exceptional shall not be regarded within its purview" *Id.* at 282, 17 S.Ct. 326.

■ The tragic facts of the present case, including the violent death of baby Shedina P. as allegedly witnessed by both the plaintiffs, easily lend themselves to a comparison of the horrors associated with the system of antebellum slavery. The Court is not unsympathetic to the tragedies both Teresa T. and Zazsheen P. suffered in their home. The Thirteenth Amendment, as interpreted by the Supreme Court and other federal courts, however, does not afford the plaintiffs a cause of action in this case. The complaint does not allege that the plaintiffs were subjugated to any type of "compulsory labor akin to African slavery," *United States v. Kozminski*, 487 U.S. 931, 942, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988), which the Thirteenth Amendment prohibits. "The essence of a holding to the involuntary servitude is an exercise of control by one person over another so that the latter is coerced into laboring for the former." *United States v. Lewis*, 644 F.Supp. 1391, 1401 (W.D.Mich.1986) *aff'd sub nom.*, *United States v. King*, 840 F.2d 1276 (6th Cir.1988).

it." *Chrissy F. v. Mississippi Dep't of Pub. Welfare*, 925 F.2d 844, 852 (5th Cir.1991).

The fifth cause of action, alleging a violation of the plaintiffs' Thirteenth Amendment rights, fails to state cause of action and is, therefore, dismissed.

## CONCLUSION

For the reasons stated herein, the motion of the defendants, Robert Windom and the Hill Health Center, to substitute the United States as a defendant for them (document no. 34) is GRANTED. The motion of the defendant, the United States, to dismiss the action against it (document no. 34) is GRANTED, without prejudice to the plaintiffs' filing of an administrative appeal. The motion of the defendants, Mary Ellen Tatten, Kenneth Mysogland, Joann Perry, Kenneth Armstrong and Marilyn Ortiz, to dismiss the complaint (document no. 45) is GRANTED to the extent that the complaint alleges violations of the plaintiffs' substantive and procedural due process rights under the United States Constitution; the fifth cause of action is dismissed in its entirety.