SEALED, Plaintiffs–Appellants,

v.

SEALED, Defendants–Appellees.

Docket No. 02–7164.

United States Court of Appeals,
Second Circuit.

Argued: Jan. 9, 2003.

Questions Certified to the Connecticut
Supreme Court: June 13, 2003.

Raymond J. Rigat, Gilbride & Rigat, Clinton, CT, for Plaintiffs–Appellants.

Benjamin Zivyon, Assistant Attorney General, Hartford, CT (Richard Blumenthal, Attorney General of Connecticut, Gregory T. D'Auria, Associate Attorney General, Susan T. Pearlman, Assistant Attorney General, on the brief) for Defendants–Appellees.

Before: F.I. PARKER, STRAUB, and SACK, Circuit Judges.

STRAUB, Circuit Judge.

Plaintiffs–Appellants, Teresa T. ("Teresa") and Zazsheen P. ("Zazsheen"), minor children who are presently in foster care, assert various constitutional claims against defendant employees of the Connecticut Department of Children and Families

("DCF") based on the defendants' alleged failure to protect the plaintiffs from their stepfather's severe physical abuse by removing plaintiffs from their home. The United States District Court for the District of Connecticut (Alfred V. Covello, *then-Chief Judge*) dismissed plaintiffs' procedural due process claims, rejecting plaintiffs' argument that Connecticut's child welfare statutes, Conn. Gen.Stat. §§ 17a–90, *et seq.*, create a constitutionally enforceable right to child protective services subject to due process protection. *See Teresa T. v. Ragaglia*, 154 F.Supp.2d 290, 303–05 (D.Conn.2001). Although we agree with the District Court's reasoning in substantial part, we find the language of Conn. Gen.Stat. § 17a–101g(c) which provides for the emergency removal of children "in imminent risk of physical harm" when immediate removal "is necessary to ensure the child's safety" somewhat ambiguous. Due to the lack of state precedent interpreting this provision, and in recognition of the paramount state interest in protecting abused children, we conclude that the Connecticut Supreme Court should have the first opportunity to clarify the scope of § 17a–101g(c) upon certification from this Court.

## BACKGROUND

The tragic facts of this case are set forth in detail in the District Court's decision, familiarity with which is presumed. *See Teresa T.*, 154 F.Supp.2d at 294–97. In order to frame the issues on appeal, we briefly summarize plaintiffs' allegations.

Plaintiffs' family was first brought to the attention of the DCF in October 1996 when a teacher at Teresa's school reported signs of possible abuse, including marks on Teresa's neck and troubling weight loss.

After an initial inquiry, a DCF investigation worker confirmed that Teresa—who was twelve years old at the time, autistic, and non-verbal—was in need of immediate DCF services given the unexplained bruises on her neck and her noticeable weight loss. According to the plaintiffs' allegations, which we must accept as true at the pleading stage, *see Olmsted v. Pruco Life Ins. Co. of New Jersey*, 283 F.3d 429, 432 (2d Cir.2002), during the three-month period between October 1996 and January 1997 when the DCF closed its case on the plaintiffs' family, defendants failed to conduct an adequate investigation into the initial reports of abuse and ignored multiple signs of obvious neglect and abuse.

The social-worker trainee assigned as the family's DCF caseworker visited plaintiffs' home several times and spoke with plaintiffs' mother, Ms. G. The caseworker learned that the plaintiffs' stepfather, Joseph P., lived with them occasionally, but plaintiffs' mother refused to answer any additional questions about the stepfather. After some difficulty, the caseworker managed to meet Joseph P., but he was loud, belligerent, and disruptive during the conversation, making it increasingly difficult for the caseworker to communicate freely with plaintiffs' mother.

Teresa's teacher also informed the caseworker that she was worried about Teresa's weight, especially Teresa's significant weight loss over Thanksgiving break. In addition, the teacher indicated that Teresa had been observed eating frantically and explained that the school had been feeding Teresa double portions of both breakfast and dinner.[1] The teacher further expressed concern that Teresa was losing her hair and that she would come to school

---

1. The DCF caseworker was able to confirm the teacher's observations by obtaining weight logs from the school which documented Teresa's significant weight loss during the course of long weekends and school vacations.

with body odor and unclean clothes. Finally, Teresa's teacher informed the caseworker that the school was concerned about Joseph P. being in the plaintiffs' home, because he had asked the school bus driver for money on several occasions.

During the investigation, the caseworker also learned that the Department of Mental Retardation had been working with the plaintiffs' family for over a year and that the plaintiffs' mother had been noncooperative. Moreover, after Ms. G was evaluated for substance abuse, the drug counselor reported that Ms. G was very angry during the interview and recommended further testing and psychological evaluation. The counselor also privately informed the caseworker that he had a "hot" case on his hands and that she was afraid that Ms. G had other problems besides potential drug abuse.

In December 1996, Teresa received a full medical examination at the Hill Health Center ("HHC") in New Haven. The HHC doctor indicated that Teresa was in "good physical condition" and that he had "no concerns regarding her health or weight loss." However, the DCF caseworker apparently did not credit the doctor's assessment and asked that Teresa be examined by another physician—an examination which never occurred.[2] In January 1997, the DCF caseworker arranged to have respite care provided to plaintiffs' family through the Benhaven agency in coordination with the Department of Mental Retardation. Before those services began, the coordinator of Benhaven, T. Lowe ("Lowe"), visited the plaintiffs' home with the DCF caseworker. Lowe observed a sparsely furnished apartment, with almost

no light, filled with a peculiar odor. She informed the DCF caseworker that her agency could not provide the plaintiffs' family with the intensive services which the family obviously needed.

Despite this warning, respite services began, but were soon terminated after the service provider assigned to the plaintiffs' family reported to Lowe that Joseph P. had called her at home, "street talked" her, and requested sexual favors. The service provider also informed Lowe that plaintiffs' home smelled of urine, was unclean and unsafe, and was otherwise inappropriate for children. The Benhaven agency subsequently cancelled respite services. Lowe again informed the DCF caseworker that the plaintiffs' family required more intensive services. Inexplicably, the caseworker responded by informing Lowe that he had closed the DCF file on the plaintiffs' family.

On January 26, 1997, plaintiffs' eight month old sister, Shedina P. ("Shedina"), was brought to the emergency room with severe head trauma and several rib fractures which the emergency room doctor found to be consistent with child abuse. As a result of her injuries, Shedina died three days later. Only at this time did the DCF place a 96–hour hold on plaintiffs due to the agency's assessment that the plaintiffs were at risk of imminent harm.[3] Plaintiffs were eventually placed in foster care. Later, in February 1997, plaintiffs' mother revealed to the DCF caseworker that Joseph P. had abused plaintiffs and Shedina on numerous occasions and that plaintiffs witnessed the beating which ultimately led to Shedina's death. Ms. G

---

**2.** A different HHC doctor later informed the DCF caseworker that Teresa's systematic starvation would have been obvious to any concerned medical care provider from Teresa's medical records.

**3.** Even after learning that Shedina had been admitted to the hospital, the DCF permitted plaintiffs to remain at home under their stepfather's supervision before removing plaintiffs from their home.

indicated that she had been too afraid to report the abuse earlier and that Joseph P. "coached" her on how to the answer the caseworker's questions to avoid detection.

Plaintiffs brought this action in June 2000 by their next friend, asserting various claims pursuant to 42 U.S.C. § 1983 and under state law. Defendant DCF officials moved to dismiss under Fed.R.Civ.P. 12(b)(6). By written decision, the District Court granted the motion as to plaintiffs' procedural due process claims, concluding that the procedures set forth in Connecticut's child welfare statutes do not give rise to a legitimate claim of entitlement on which a procedural due process claim may be grounded.[4] *See Teresa T.*, 154 F.Supp.2d at 303–06. Plaintiffs subsequently obtained both the District Court's as well as this Court's permission to pursue an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), and the District Court stayed further proceedings pending resolution of this appeal.

## DISCUSSION

■ We review the dismissal of plaintiffs' claims *de novo, see Cicio v. Does,* 321 F.3d 83, 89 (2d Cir.2003), and will affirm only if "it appears beyond doubt that the plaintiff[s] can prove no set of facts ... which would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). This rule "applies with particular force" in this case, as plaintiffs seek to vindicate their civil rights. *See Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998).

■ In analyzing plaintiffs' procedural due process claims, we must first determine (1) whether plaintiffs possessed a protected liberty or property interest, and,

if so, (2) what process plaintiffs were due before they could be deprived of that interest. *See Ciambriello v. County of Nassau,* 292 F.3d 307, 313 (2d Cir.2002). Because the District Court found that plaintiffs could not establish the existence of any interest entitled to due process protection, it never reached the second part of the inquiry. We too focus on this threshold question, but for the reasons explained below, seek further guidance from the Connecticut Supreme Court as to the content of the applicable state law.

## A. State Created Interest

■ Although some due process protections stem independently from the Fourteenth Amendment, state law may also create liberty or property interests entitled to due process protection. *See Paul v. Davis,* 424 U.S. 693, 711 & n. 5, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In this case, plaintiffs do not contend that the state of Connecticut has a constitutional obligation to protect them from child abuse, *see De-Shaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 196–97, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (holding that states have no substantive due process obligation to protect children against private violence), instead they argue that Connecticut's comprehensive child welfare scheme, Conn. Gen.Stat. §§ 17a–90, *et seq.,* creates an entitlement to protective services subject to Fourteenth Amendment scrutiny. This type of procedural due process claim was left undecided by the Supreme Court in *DeShaney. DeShaney,* 489 U.S. at 195 n. 2, 109 S.Ct. 998 (refusing to address petitioners' alternative argument that Wisconsin's child protection statutes created an entitlement to protective services in accordance with the terms of the statutes).

---

4. The District Court also dismissed plaintiffs' substantive due process and Thirteenth Amendment claims, rulings which are not on appeal. *See Teresa T.,* 154 F.Supp.2d at 301–03, 305–06.

■ For the sake of clarity, we parse plaintiffs' argument into two separate components. The question of whether an asserted interest "rises to the level of a legitimate claim of entitlement protected by the Due Process Clause" is indisputably a constitutional question governed by federal law. *Ciambriello*, 292 F.3d at 313, 292 F.3d 307 (quoting *Ezekwo v. NYC Health & Hosps. Corp.*, 940 F.2d 775, 782 (2d Cir.1991)). However, where the claimed interest is rooted in state law, we look to the particular state "statute, contract, or regulation that purports to establish" the asserted entitlement in order to assess the parameters and the strength of the alleged interest to determine if due process protection applies. *Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 30 (2d Cir.1994); *see also Ciambriello*, 292 F.3d at 317 ("In determining whether a particular property interest rises to the level of constitutional protection, a court must look to whether the interest involved would be protected under state law and must weigh the importance to the holder of the right." (internal quotations omitted)). Thus, in analyzing plaintiffs' claims we must first understand the underlying Connecticut child welfare statutes and then determine whether those statutes create a protected property or liberty interest.

■ In evaluating whether a state has created a protected interest in the administrative context, we must determine whether the state statute or regulation at issue meaningfully channels official discretion by mandating a defined administrative outcome. As the Supreme Court has explained: "[A] State creates a protected liberty interest by placing substantive limitations on official discretion.... [generally] by establishing substantive predicates to govern official decision-making, and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (internal quotations and citations omitted). Similarly, to claim a protected property interest in a particular administrative benefit or measure, an individual must have "a legitimate claim of entitlement" in receiving the benefit or measure, not merely "a unilateral expectation" in a desired administrative outcome. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Where the administrative scheme does not require a certain outcome, but merely *authorizes* particular actions and remedies, the scheme does not create "entitlements" that receive constitutional protection under the Fourteenth Amendment. *See Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 175 (2d Cir.1991) ("If the statute, regulation, or contract in issue vests in the state significant discretion over the ... conferral of [a] benefit, it will be the rare case that the recipient will be able to establish an entitlement to that benefit.").

■ In support of their due process claims, plaintiffs rely on the statutorily expressed public policy of the state of Connecticut:

> To protect children whose health and welfare may be adversely affected through injury and neglect ... [and] to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family.

Conn Gen Stat. § 17a–101(a). However, this policy statement creates *no discrete rights or reasonable expectations* in any specific protective measures. *See Savage v. Aronson*, 214 Conn. 256, 279 n. 25, 571

A.2d 696 (1990) ("[The] general statement of the goals of our child welfare laws, although valuable as an aid in construing ambiguous provisions of such statutes, creates no rights beyond those specifically provided by the statutes intended to implement that statement of policy.").

Plaintiffs also point to the detailed and comprehensive procedures for investigating potential child abuse mandated by state law. We emphasize that such *procedures*, standing alone, create no independent *substantive* entitlements, whose deprivation might trigger application of the Due Process Clause. *See Olim v. Wakinekona*, 461 U.S. 238, 250–51, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) ("The State may choose to require procedures ... but in making that choice the State does not create an independent substantive right."); *Hewitt v. Helms*, 459 U.S. 460, 471, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (explaining that the existence of "a careful procedural structure" does not give rise to a protected liberty interest).[5]

### B.   Conn. Gen.Stat. § 17a–101g(c)

The child welfare statutes which plaintiffs rely upon set forth requirements for the immediate classification and evaluation of child abuse reports, the timely initiation of an investigation, and the conduct of the investigation. *See* Conn. Gen.Stat. §§ 17a–101g(a)–(b).[6]   While outlining a series of mandatory procedures for the investigation of child abuse, these provisions still invest significant discretion in the DCF to determine both whether an investigation is warranted and what remedial action, if any, to pursue based on the results of the investigation.

We can identify only one statutory provision which may require the DCF to take specific substantive action. Conn Gen. Stat. § 17a–101g(c) states:

> If the Commissioner of Children and Families, or his designee, has probable cause to believe that the child or any other child in the household is in imminent risk of physical harm from his surroundings and that immediate removal from such surroundings is necessary to ensure the child's safety, the commissioner, or his designee, *shall authorize* any employee of the department or any law enforcement officer to remove the child and any other child similarly situated from such surroundings without the consent of the child's parent or guardian.

(emphasis added).[7]   We find the language of this provision, particularly the phrase "shall authorize," somewhat ambiguous. It is unclear whether § 17a–101g(c) specifically *requires* the Commissioner to order removal—upon finding probable cause to believe a child is at imminent risk and

---

**5.**   "[E]levating a state-mandated procedure to the status of a constitutionally protected" liberty or property interest, *see Doe v. Milwaukee County*, 903 F.2d 499 (7th Cir.1990), would make process "an end in itself" rather than a requirement whose "constitutional purpose is to protect a substantive interest in which the individual has a claim of entitlement." *Olim*, 461 U.S. at 250–51, 103 S.Ct. 1741.

**6.**   For example, an investigation must include a home visit, and the DCF is required to prepare a written report of the investigation which includes "a review of criminal conviction information concerning the person or persons alleged to be responsible for [the suspected] abuse or neglect and previous allegations of abuse or neglect relating to the child or other children residing in the household or relating to family violence." Conn. Gen.Stat. § 17a–101g(b).

**7.**   Emergency removal under § 17a–101g(c) may not exceed 96 hours. If a child is not returned home within 96 hours, foster care proceedings pursuant to Conn. Gen.Stat. § 46b–129 must be initiated. *See* Conn. Gen. Stat. § 17a–101g(c).

determining that immediate removal is necessary to ensure the child's safety—or merely *authorizes* the Commissioner to seek removal under such circumstances. Moreover, since the statute speaks only in terms of authorizing removal by a DFC employee or law enforcement officer, it is unclear whether that employee or officer has a continuing statutory obligation to remove the child once the initial authorization is granted. Finally, the parties have pointed to no state court decisions, nor have we been able to find any Connecticut caselaw clarifying the meaning of § 17a–101g(c).

This presents significant difficulties for this Court in analyzing plaintiffs' due process claims. Without a clear understanding of the underlying state law, we cannot determine in an informed manner whether plaintiffs have a legitimate entitlement to emergency removal potentially triggering Fourteenth Amendment protection. If § 17a–101g(c) makes removal mandatory, we cannot say at this preliminary stage of the litigation that plaintiffs have failed to allege the existence of a protected property or liberty interest.[8] *Cf. Gonzales v. City of Castle Rock,* 307 F.3d 1258, 1264–66 (10th Cir.2002) (concluding that a Colorado statute providing that peace officers "*shall* arrest [or] . . . seek a warrant for the arrest of a restrained person when the peace officer has information amounting to probable cause that . . . [t]he restrained

person has violated or attempted to violate any provision of a restraining order" creates a "legitimate claim of entitlement to the protection provided by arrest" in the holder of a restraining order sufficient to support a procedural due process claim) (emphasis in original).[9]

Although similar due process claims have been rejected by other circuits, in none of these prior cases did the court actually reach the question of whether a child welfare statute *required* removal of a child from an unsafe environment, thus potentially imposing substantive as well as procedural requirements on state officials and creating a liberty or property interest sufficient to state a procedural due process claim. *See Doe v. District of Columbia,* 93 F.3d 861, 867–68 (D.C.Cir.1996) (per curiam) ("[B]y codifying procedures for investigating child abuse and neglect reports, D.C. has not assumed a constitutional obligation to protect children from such abuse and neglect."); *Tony L. v. Childers,* 71 F.3d 1182, 1186 (6th Cir.1995) ("[Plaintiffs'] claim of a state-created liberty interest fails, however, because no particular substantive outcome is mandated. The requirement that an investigation be initiated only gives plaintiffs an expectation of receiving a certain process."); *Doe v. Milwaukee County,* 903 F.2d 499, 503 (7th Cir.1990) (noting that particular statute cited by plaintiffs "is, in essence, a set

---

8. We need not decide at this juncture whether plaintiffs' alleged "entitlement" to removal pursuant to § 17a–101g(c) is best characterized as a liberty interest or a property interest for due process purposes.

9. In *Gonzales,* as in this case, the state statute at issue mandates official action only upon an initial finding of "probable cause." We agree with the Tenth Circuit's conclusion that such a statute may nonetheless mandate a defined outcome, thus creating a protected interest for procedural due process purposes. *See Gonzales,* 307 F.3d at 1266 (rejecting argu-

ment "that because the officer's mandatory [statutory] duty to arrest only arises upon the existence of facts giving rise to probable cause, no legitimate claim of entitlement can ever exist"). Accepting the truth of plaintiffs' allegations, we must assume that defendants had probable cause to believe that immediate removal of plaintiffs from their home was necessary to prevent imminent physical harm and inquire as to whether § 17a–101g(c) mandates removal where such probable cause exists.

of *procedures* that guides Wisconsin counties in their efforts to prevent child abuse ... [b]ut the procedures themselves are not 'benefits' within the meaning of Fourteenth Amendment jurisprudence"); *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 392 (4th Cir.1990) ("[Plaintiff] has no property or liberty interest in the specific investigative procedures which he contends were neglected."). Indeed, as these cases dealt with child welfare statutes from other states, they provide only marginal guidance in this case, and highlight the need for a careful reading of § 17a–101g(c).

## C. Certification

■■■■■■ Under these circumstances, we believe that certification to the Connecticut Supreme Court is the most prudent path.[10] *See* Conn. Gen.Stat. § 51–199b(d). Although this Court may ordinarily interpret ambiguous state statutes using the normal rules of statutory interpretation, even in the absence of controlling state authority, several factors strongly suggest that we defer to the Connecticut Supreme Court in this case. First, there can be no doubt that Connecticut has a compelling interest in protecting child welfare. *See Israel v. State Farm Mut. Auto. Ins. Co.*, 239 F.3d 127, 135 (2d Cir.2000) (indicating that certification is appropriate where the state has a strong interest in deciding an issue). Second, because § 17a–101g(c) forms only one part of a detailed administrative scheme, we hesitate to interfere in and potentially disrupt Connecticut's well-considered process for investigating child abuse—an area in which the federal courts have little familiarity or expertise. *See id.* (explaining that certification is particularly appropriate in fields, such as insurance

law, where the state has special expertise). Finally, the ambiguity in § 17a–101g(c) may well be resolved with reference to the public policy goals underlying Connecticut's child welfare laws expressed in § 17a–101(a). Where a question of statutory interpretation implicates the weighing of policy concerns, principles of comity and federalism strongly support certification. *Cf. Cweklinsky v. Mobil Chem. Co.*, 297 F.3d 154, 160 (2d Cir.2002). Notably, the Connecticut Supreme Court has recently indicated that it adopts a broad approach to statutory interpretation that looks beyond the statutory text "to the legislative history and circumstances surrounding [the statute's] enactment, to the legislative policy [the statute] was designed to implement, and to [the statute's] relationship to existing legislation and common law principles governing the same general subject matter." *State v. Courchesne*, 262 Conn. 537, 577, 816 A.2d 562 (2003) (internal quotations and citation omitted). Thus, the Connecticut Supreme Court may well exercise "more flexibility and broader interpretive power" than the federal courts in analyzing the meaning of § 17a–101g(c). *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 152 (2d Cir.2001); *see also Majors v. Abell*, 317 F.3d 719, 724 (7th Cir.2003) ("A state court is bound to have a better idea of the elasticity of the state's statutes than a federal court . . . .").

## CONCLUSION

For the foregoing reasons, we respectfully certify to the Connecticut Supreme Court the following questions:

(1) If the Commissioner of Children and Families had probable cause to believe that the plaintiffs were in imminent risk of physical harm and that

---

**10.** Although the parties did not request certification, we are empowered to seek certification *nostra sponte*. *See* 2d Cir. R. § 0.27.

immediate removal was necessary to ensure the plaintiffs' safety, was the Commissioner then *required* to cause plaintiffs' removal pursuant to Conn. Gen Stat. § 17a–101g(c), or would the existence of probable cause only *authorize* the Commissioner to seek emergency removal based on his or her discretionary judgment?

(2) Additionally, had the Commissioner authorized removal of plaintiffs pursuant to § 17a–101g(c), would the designated DCF employee or law enforcement officer have been statutorily required, or merely authorized, to remove plaintiffs from their home?

Although the ultimate question of whether § 17a–101g(c) creates a protected liberty or property interest is governed by federal law, we welcome any further guidance which the Connecticut Supreme Court may elect to offer with respect to related state law issues. Accordingly, the certified questions may be deemed expanded to cover any further pertinent question of Connecticut law that the Supreme Court finds appropriate to answer in connection with this appeal. This panel retains jurisdiction so that we may dispose of the appeal following the Connecticut Supreme Court's decision.[11]

It is hereby ORDERED that the Clerk of this court transmit to the Clerk of the Connecticut Supreme Court a Certificate, as set forth below, together with a complete set of briefs and appendices filed in this court by the parties.

### CERTIFICATE

The foregoing is hereby certified to the Connecticut Supreme Court, pursuant to 2d Cir. R. § 0.27 and Conn. Gen.Stat. § 59–199b(d), as ordered by the United States Court of Appeals for the Second Circuit.

---

**11.** Defendants urge us to dismiss on various alternative grounds not reached by the District Court. Even if plaintiffs can demonstrate a protected *property or liberty interest,* to state a viable procedural due process claim plaintiffs will also have to identify the additional process which defendants allegedly failed to provide, and demonstrate that the alleged deprivation was pursuant to an established state policy or procedure. *See Doe v. District of Columbia,* 93 F.3d at 868–69. Without a clear understanding of the meaning of § 17a–101g(c) and the specific interest at stake, we cannot resolve these other issues confidently or coherently. We therefore reserve decision on these issues pending certification to the Connecticut Supreme Court.