TERESA T. ET AL.* *v.* KRISTINE
RAGAGLIA ET AL.
(SC 17033)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued September 23, 2004—officially released February 8, 2005

*Raymond J. Rigat,* for the appellants (plaintiffs).

*Benjamin Zivyon,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, *Gregory T. D'Auria,* associate attorney gen-

eral, and *Susan T. Pearlman, Jane R. Rosenberg* and *Michael Besso*, assistant attorneys general, for the appellees (defendants).

*Paul Chill, James Aerykssen*, certified legal intern, and *Matthew Skahill*, certified legal intern, filed a brief for the Child Welfare League of America, Inc., as amici curiae.

*Opinion*

ZARELLA, J. The dispositive issue in this case, which comes to us on certification from the United States Court of Appeals for the Second Circuit pursuant to General Statutes § 51-199b (d) and Practice Book § 82-1,[1] is whether the commissioner of children and families (commissioner) is required to remove a child from his or her surroundings pursuant to General Statutes § 17a-101g (c)[2] if the commissioner has probable cause to

---

[1] General Statutes § 51-199b, the Uniform Certification of Questions of Law Act, provides in relevant part: "(d) The Supreme Court may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state. . . ."

Practice Book, 2004, § 82-1 provides: "The supreme court may answer questions of law certified to it by the supreme court of the United States, a court of appeals of the United States or a United States district court when requested by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of this state."

[2] General Statutes § 17a-101g (c) provides: "If the Commissioner of Children and Families, or his designee, has probable cause to believe that the child or any other child in the household is in imminent risk of physical harm from his surroundings and that immediate removal from such surroundings is necessary to ensure the child's safety, the commissioner, or his designee, shall authorize any employee of the department or any law enforcement officer to remove the child and any other child similarly situated from such surroundings without the consent of the child's parent or guardian. The commissioner shall record in writing the reasons for such removal and include such record with the report of the investigation conducted under subsection (b) of this section."

believe that the child is in imminent risk of physical harm and that immediate removal is necessary to ensure the child's safety. We conclude that § 17a-101g (c) does not require the commissioner to remove the child upon a finding of probable cause, but merely authorizes the commissioner to seek removal under such circumstances.

The minor plaintiffs, Teresa T. and Zazsheen P., brought this action in the United States District Court for the district of Connecticut claiming that the commissioner and certain employees of the department of children and families (department)[3] had violated their constitutional rights by failing to protect them from their abusive stepfather by removing them from their home. The District Court dismissed the plaintiffs' procedural due process claims on the ground that the Connecticut child protection statutes, General Statutes § 17a-90 et seq., do not "create a constitutionally enforceable right to child protective services subject to due process protection." *Sealed* v. *Sealed*, 332 F.3d 51, 53 (2d Cir. 2003). The plaintiffs subsequently obtained permission from both the District Court and the Court of Appeals to pursue an interlocutory appeal from the District Court's order dismissing that portion of their complaint. Id., 55.

The record certified by the Second Circuit provides the following facts. "[The family of the minor plaintiffs] was first brought to the attention of the [department] in October 1996 when a teacher at Teresa's school reported signs of possible abuse, including marks on Teresa's neck and troubling weight loss. After an initial inquiry, a [department] investigation worker confirmed that Teresa—who was twelve years old at the time,

---

[3] The other department employees named as defendants in this appeal are: Mary Ellen Tatten, regional director; Kenneth Mysogland, program supervisor; Joann Perry, social work supervisor; Kenneth Armstrong, treatment social worker; and Marilyn Ortiz, investigation worker.

autistic, and non-verbal—was in need of immediate [department] services given the unexplained bruises on her neck and her noticeable weight loss. According to the plaintiffs' allegations . . . during the three-month period between October 1996 and January 1997 when the [department] closed its case on the plaintiffs' family, [the] defendants failed to conduct an adequate investigation into the initial reports of abuse and ignored multiple signs of obvious neglect and abuse.

"The social-worker trainee assigned as the family's [department] caseworker visited [the] plaintiffs' home several times and spoke with [the] plaintiffs' mother, Ms. G. The caseworker learned that the plaintiffs' stepfather, Joseph P., lived with them occasionally, but [the] plaintiffs' mother refused to answer any additional questions about the stepfather. After some difficulty, the caseworker managed to meet Joseph P., but he was loud, belligerent, and disruptive during the conversation, making it increasingly difficult for the caseworker to communicate freely with [the] plaintiffs' mother.

"Teresa's teacher also informed the caseworker that she was worried about Teresa's weight, especially Teresa's significant weight loss over Thanksgiving break. In addition, the teacher indicated that Teresa had been observed eating frantically and explained that the school had been feeding Teresa double portions of both breakfast and dinner. The teacher further expressed concern that Teresa was losing her hair and that she would come to school with body odor and unclean clothes. Finally, Teresa's teacher informed the caseworker that the school was concerned about Joseph P. being in the plaintiffs' home, because he had asked the school bus driver for money on several occasions.

"During the investigation, the caseworker also learned that the [d]epartment of [m]ental [r]etardation had been working with the plaintiffs' family for over a

year and that the plaintiffs' mother had been noncooperative. Moreover, after Ms. G was evaluated for substance abuse, the drug counselor reported that Ms. G was very angry during the interview and recommended further testing and psychological evaluation. The counselor also privately informed the caseworker that he had a 'hot' case on his hands and that she was afraid that Ms. G had other problems besides potential drug abuse.

"In December 1996, Teresa received a full medical examination at the Hill Health Center ('HHC') in New Haven. The HHC doctor indicated that Teresa was in 'good physical condition' and that he had 'no concerns regarding her health or weight loss.' However, the [department] caseworker apparently did not credit the doctor's assessment and asked that Teresa be examined by another physician—an examination which never occurred. In January 1997, the [department] caseworker arranged to have respite care provided to [the] plaintiffs' family through the Benhaven agency in coordination with the [d]epartment of [m]ental [r]etardation. Before those services began, the coordinator of Benhaven, T. Lowe ('Lowe'), visited the plaintiffs' home with the [department] caseworker. Lowe observed a sparsely furnished apartment, with almost no light, filled with a peculiar odor. She informed the [department] caseworker that her agency could not provide the plaintiffs' family with the intensive services which the family obviously needed.

"Despite this warning, respite services began, but were soon terminated after the service provider assigned to the plaintiffs' family reported to Lowe that Joseph P. had called her at home, 'street talked' her, and requested sexual favors. The service provider also informed Lowe that [the] plaintiffs' home smelled of urine, was unclean and unsafe, and was otherwise inappropriate for children. The Benhaven agency subsequently cancelled respite services. Lowe again informed

the [department] caseworker that the plaintiffs' family required more intensive services. Inexplicably, the caseworker responded by informing Lowe that he had closed the [department] file on the plaintiffs' family.

"On January 26, 1997, [the] plaintiffs' eight month old sister, Shedina P. ('Shedina'), was brought to the emergency room with severe head trauma and several rib fractures which the emergency room doctor found to be consistent with child abuse. As a result of her injuries, Shedina died three days later. Only at this time did the [department] place a [ninety-six] hour hold on [the] plaintiffs due to the agency's assessment that the plaintiffs were at risk of imminent harm. [The] [p]laintiffs were eventually placed in foster care. Later, in February 1997, [the] plaintiffs' mother revealed to the [department] caseworker that Joseph P. had abused [the] plaintiffs and Shedina on numerous occasions and that [the] plaintiffs witnessed the beating which ultimately led to Shedina's death. Ms. G indicated that she had been too afraid to report the abuse earlier and that Joseph P. 'coached' her on how to . . . answer the caseworker's questions to avoid detection." Id., 53–55.

In its decision concerning the District Court's order of dismissal, the Court of Appeals explained that "in analyzing [the] plaintiffs' [procedural due process] claims we must first understand the underlying Connecticut child welfare statutes and then determine whether those statutes create a protected property or liberty interest.

"In evaluating whether a state has created a protected interest in the administrative context, we must determine whether the state statute or regulation at issue meaningfully channels official discretion by mandating a defined administrative outcome. . . . Where the administrative scheme does not require a certain outcome, but merely *authorizes* particular actions and

remedies, the scheme does not create entitlements that receive constitutional protection under the [f]ourteenth [a]mendment [to the United States constitution]." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 56.

The Court of Appeals identified only one provision in the Connecticut statutory scheme, namely, § 17a-101g (c), that might require the department to take specific substantive action and thus create a protected liberty or property interest under the fourteenth amendment. See id., 57. The court, however, found the language of that provision, particularly the phrase " 'shall authorize,' somewhat ambiguous." Id. The court stated that this ambiguity presented "significant difficulties . . . in analyzing [the] plaintiffs' [procedural] due process claims. Without a clear understanding of the underlying state law, we cannot determine in an informed manner whether [the] plaintiffs have a legitimate entitlement to emergency removal potentially triggering [f]ourteenth [a]mendment protection." Id., 58. Accordingly, the Court of Appeals certified the following questions of law to this court to clarify the scope of the statute: "(1) If the [commissioner] had probable cause to believe that the plaintiffs were in imminent risk of physical harm and that immediate removal was necessary to ensure the plaintiffs' safety, was the [c]ommissioner then *required* to cause [the] plaintiffs' removal pursuant to . . . § 17a-101g (c), or would the existence of probable cause only *authorize* the [c]ommissioner to seek emergency removal based on his or her discretionary judgment?

"(2) Additionally, had the [c]ommissioner authorized removal of [the] plaintiffs pursuant to § 17a-101g (c), would the designated [department] employee or law enforcement officer have been statutorily required, or merely authorized, to remove [the] plaintiffs from their home?" (Emphasis in original.) Id., 59–60. The court

also stated: "[T]he certified questions may be deemed expanded to cover any further pertinent question of Connecticut law that the Supreme Court finds appropriate to answer in connection with this appeal." Id., 60.

Issues of statutory construction present questions of law, over which we exercise plenary review. See *Wiseman* v. *Armstrong*, 269 Conn. 802, 809, 850 A.2d 114 (2004). When construing a statute, we first look to its text, as directed by Public Acts 2003, No. 03-154, § 1 (P.A. 03-154), which provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."[4] When a statute is not plain and unambiguous, we also seek interpretive guidance from the legislative history of the statute and the circumstances surrounding its enactment, the legislative policy it was designed to implement, the statute's relationship to existing legislation and common-law principles governing the same general subject matter. See *State* v. *Lutters*, 270 Conn. 198, 205, 853 A.2d 434 (2004).

The plaintiffs argue that the language of § 17a-101g (c) is clear and unambiguous and that the statute requires the commissioner to seek emergency removal of a child from unsafe surroundings upon a finding of probable cause. The plaintiffs maintain that the word "shall" ordinarily is construed as mandatory and that,

---

[4] The legislature enacted P.A. 03-154, § 1, in response to our decision in *State* v. *Courchesne*, 262 Conn. 537, 816 A.2d 562 (2003), and we have recognized that this act "has legislatively overruled that part of *Courchesne* in which we stated that we would not require a threshold showing of linguistic ambiguity as a precondition to consideration of sources of the meaning of legislative language in addition to its text." *Paul Dinto Electrical Contractors, Inc.* v. *Waterbury*, 266 Conn. 706, 716 n.10, 835 A.2d 33 (2003).

because the word "shall" in this case relates to the essence of the statute itself, it necessarily imposes a mandatory duty on the commissioner. They also assert that the department policy manual, which represents the views of agency officials charged with implementing the statute, interprets § 17a-101g (c) to require removal by way of a ninety-six hour hold if the commissioner believes that there is imminent risk of physical harm to the child.

The state responds that the word "shall" is not always construed as mandatory and that the commissioner does not have a mandatory duty under § 17a-101g (c) to remove a child upon a finding of probable cause. The state contends that the statute, when read in its entirety, demonstrates the discretionary nature of the commissioner's authority regarding such decisions. The state also contends that the Court of Appeals has not limited this court's interpretation of § 17a-101g (c) to the phrase "shall authorize," but seeks an interpretation of the statute in light of the broader statutory scheme pertaining to child protection. We agree with the state.

Section 17a-101g (c) provides in relevant part: "If the Commissioner of Children and Families, or his designee,[5] has probable cause to believe that the child or any other child in the household is in imminent risk of physical harm from his surroundings and that immediate removal from such surroundings is necessary to ensure the child's safety, the commissioner, or his designee, *shall authorize* any employee of the department or any law enforcement officer to remove the child and any other child similarly situated from such surround-

[5] The department policy manual lists the following persons as designees: deputy commissioner, bureau chief of child welfare services, administrator of the hotline, regional administrators, regional program directors and program supervisors. See Department of Children and Families Policy Manual, Vol. II, § 34-10-4, p. 2.

ings without the consent of the child's parent or guardian. . . ." (Emphasis added.)

We conclude that the language of the statute is not plain and unambiguous because it does not expressly require the commissioner to remove a child from unsafe surroundings upon a finding of probable cause.[6] Moreover, although we "have often stated [that] [d]efinitive words, such as must or shall, ordinarily express legislative mandates of a nondirectory nature"; (internal quotation marks omitted) *Lostritto* v. *Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 20, 848 A.2d 418 (2004); we also have noted that the "use of the word shall, though significant, does not invariably establish a mandatory duty." (Internal quotation marks omitted.) *State* v. *Pare*, 253 Conn. 611, 623, 755 A.2d 180 (2004). Furthermore, a requirement stated in affirmative terms unaccompanied by negative words, as in the present case, generally is not viewed as mandatory. See *Fidelity Trust Co.* v. *BVD Associates*, 196 Conn. 270, 278, 492 A.2d 180 (1985).

Finally, although the word "authorize" has been construed in certain contexts as having a mandatory effect; see Black's Law Dictionary (6th Ed. 1990); the common understanding of the term as expressed in the law and in dictionaries is "[t]o endow with authority or effective legal power"; id.; which does not imply a mandatory duty. See *State* v. *Vickers*, 260 Conn. 219, 224, 796 A.2d 502 (2002) ("[w]here a statute does not define a term it is appropriate to look to the common understanding expressed in the law and in dictionaries" [internal quotation marks omitted]). As a result, it is not entirely

---

[6] Both parties filed supplemental briefs addressing whether § 1 of P.A. 03-154 violates the doctrine of separation of powers under the state and federal constitutions. Our conclusion that the language of § 17a-101g (c) is ambiguous, however, makes it unnecessary for this court to determine the constitutionality of P.A. 03-154, § 1, for purposes of analyzing the two certified questions.

clear whether the phrase "shall authorize" was intended by the legislature to mandate that the commissioner remove a child from unsafe surroundings under a ninety-six hour hold. "[T]his court cannot, by judicial construction, read into legislation provisions that clearly are not contained therein." *Stitzer* v. *Rinaldi's Restaurant*, 211 Conn. 116, 119, 557 A.2d 1256 (1989). We therefore must look to other statutory language within the broader statutory scheme and extratextual evidence to determine the statute's meaning. See *State* v. *Lutters*, supra, 270 Conn. 205, 212.

Employing the ordinary tools of statutory construction, we conclude that the commissioner is not statutorily required to remove a child in imminent risk of physical harm pursuant to § 17a-101g (c). The discretionary nature of the commissioner's authority is suggested initially by the opening words of the statute, "[i]f the [c]ommissioner . . . has probable cause to believe . . . ." General Statutes § 17a-101g (c). This language indicates that the commissioner has discretion to make the required finding of probable cause on the basis of his or her own judgment and conscience. See *Lombard* v. *Edward J. Peters, Jr., P.C.*, 252 Conn. 623, 628, 749 A.2d 630 (2000) ("[t]he hallmark of a discretionary act is that it requires the exercise of judgment"); Black's Law Dictionary, supra ("[w]hen applied to public functionaries, discretion means a power or right conferred upon them by law of acting officially in certain circumstances, according to the dictates of their own judgment and conscience").

The fact that a probable cause determination is discretionary, however, does not necessarily mean that the action to follow is discretionary. See *Gonzales* v. *Castle Rock*, 366 F.3d 1093, 1103–1106 (10th Cir. 2004) (en banc) (police officer exercises judgment and discretion in making probable cause determination that restraining order was violated, but is required under

statute to arrest or seek warrant for arrest of offending party if probable cause exists). "The test to be applied in determining whether a statute is mandatory or directory is whether the prescribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience. . . . If it is a matter of substance, the statutory provision is mandatory." (Internal quotation marks omitted.) *Lostritto* v. *Community Action Agency of New Haven, Inc.*, supra, 269 Conn. 19. "If, however, the . . . provision is designed to secure order, system and dispatch in the proceedings, it is generally held to be directory . . . ." (Internal quotation marks omitted.) *Concept Associates, Ltd.* v. *Board of Tax Review*, 229 Conn. 618, 626 n.9, 642 A.2d 1186 (1994). Under these principles of statutory construction, we conclude that the phrase "shall authorize" is directory and that the statute affords the commissioner discretion in the choice of an appropriate remedy.

Section 17a-101g (c) can be understood properly only in the context of the statute as a whole. Section 17a-101g sets forth the procedures that guide the department in responding to reports of abuse. These include procedures for the immediate classification and evaluation of reported abuse; the commencement of an investigation, if warranted; the referral of certain cases to appropriate local law enforcement authorities; the removal of a child from unsafe surroundings upon a finding of probable cause; and the care and return of a child who has been removed pursuant to subsection (c). Viewed collectively, we conclude that these provisions are designed to provide order, system and dispatch in the department's response to reports of abuse. See *Concept Associates, Ltd.* v. *Board of Tax Review*, supra, 229 Conn. 626 n.9. The absence of a penalty if the commissioner fails to invoke the ninety-six hour hold after

making a finding of probable cause further suggests that § 17a-101g (c) does not impose a mandatory duty. See *Fidelity Trust Co.* v. *BVD Associates,* supra, 196 Conn. 278. Consequently, the statute should not be read to require the commissioner to remove a child under a ninety-six hour hold if probable cause exists, but to require the commissioner to follow certain procedures, including the authorization of a department employee or law enforcement officer to proceed with removal if the commissioner chooses to invoke a ninety-six hour hold.

Our construction of § 17a-101g (c) as directory rather than mandatory is consistent with the discretion afforded the commissioner in subsections (a) and (d) of the statute. Subsection (a) grants the commissioner discretion to determine whether a report of abuse contains sufficient information to require an investigation and, if sufficient information exists, whether the investigation should commence within two or seventy-two hours.[7] Subsection (d) of the statute confers additional discretion on the commissioner with respect to return of the child. Section 17a-101g (d) provides in relevant part: "The removal of a child . . . shall not exceed ninety-six hours. . . . If the child is not returned home within such ninety-six hour period, with or without protective services, the department shall proceed in accordance with section 46b-129." The commissioner therefore must decide, first, whether to return the child within ninety-six hours or to petition the court for an order of temporary custody, and, second, if he elects to return the child, whether to do so with or without

---

[7] General Statutes § 17a-101g (a) provides in relevant part: "Upon receiving a report of child abuse . . . [i]f the report contains sufficient information to warrant an investigation, the commissioner shall make the commissioner's best efforts to commence an investigation of a report concerning an imminent risk of physical harm to a child or other emergency within two hours of receipt of the report and shall commence an investigation of all other reports within seventy-two hours of receipt of the report. . . ."

protective orders. "It is an accepted principle of statutory construction that, if possible, the component parts of a statute should be construed harmoniously in order to render an overall reasonable interpretation." (Internal quotation marks omitted.) *Barco Auto Leasing Corp.* v. *House,* 202 Conn. 106, 115, 520 A.2d 162 (1987). For the statute to grant the commissioner discretion with respect to investigating a report of abuse and returning a child who has been removed, but not with respect to removing a child, is logically inconsistent and does not comport with the principle that different parts of a statute should be construed harmoniously. Id.

It also is well established that we are required "to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction. . . . In applying these principles, we are mindful that the legislature is presumed to have intended a just and rational result." (Internal quotation marks omitted.) *Secretary of the Office of Policy & Management* v. *Employees' Review Board,* 267 Conn. 255, 278, 837 A.2d 770 (2004) (*Zarella, J.,* concurring).

General Statutes § 46b-129 (a) provides the commissioner with an alternative remedy for "immediate removal" of an abused or neglected child, namely, the filing of a petition with the Superior Court for an order of temporary custody. Section 46b-129 (b) provides in relevant part: "If it appears . . . that there is reasonable cause to believe that (1) the child or youth is suffering from serious physical illness or serious physical injury or is in immediate physical danger from the child's or youth's surroundings, and (2) that as a result of said conditions, the child's or youth's safety is endangered and immediate removal from such surroundings is necessary to ensure the child's or youth's safety, the

court shall either (A) issue an order to the parents or other person having responsibility for the care of the child or youth to appear at such time as the court may designate to determine whether the court should vest in some suitable agency or person the child's or youth's temporary care and custody pending disposition of the petition, or (B) issue an order ex parte vesting in some suitable agency or person the child's or youth's temporary care and custody. . . ." General Statutes § 46b-129 (b).

The remedies provided in §§ 46b-129 (b) and 17a-101g (c) are available only upon a finding that there is probable cause[8] to believe that the child is in unsafe surroundings[9] and that immediate removal is necessary

[8] Although § 46b-129 (b) requires the court, rather than the commissioner, to make the finding of probable cause necessary to impose the statutory remedy, we presume that the commissioner would not petition the court for an order of temporary custody without a good faith belief that probable cause existed.

[9] The reasonable cause determination in § 46b-129 (b) requires a finding that the child is "suffering from serious physical illness or serious physical injury or is in immediate physical danger," whereas the probable cause determination in § 17a-101g (c) requires a finding that the child is "in imminent risk of physical harm." The word "imminent" is defined as "[n]ear at hand," "impending" and "on the point of happening . . . . Something which is threatening to happen at once, something close at hand, something to happen upon the instant . . . ." Black's Law Dictionary, supra. The word "immediate" is defined as "[p]resent; at once; without delay . . . . [T]he word . . . denotes that action is or must be taken either instantly or without any considerable loss of time." Id. In our view, this is a distinction without a difference. See also *Tenenbaum* v. *Williams*, 193 F.3d 581, 594 (2d Cir. 1999) (Using words "imminent" and "immediate" interchangeably in stating that "[w]hile there is a sufficient emergency to warrant officials' taking [a child into] custody without a prior hearing if [he or she] is *immediately* threatened with harm . . . the converse is also true. If the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, *ex parte* or otherwise, for the child's removal, then the circumstances are not emergent; there is no reason to excuse the absence of the judiciary's participation in depriving the parents of the care, custody and management of their child." [Citation omitted; emphasis altered; internal quotation marks omitted.]).

Furthermore, if the legislature had intended to distinguish between § 46b-129 (b) and § 17a-101g (c) on the basis of the urgency of the threat to the

to protect the child from harm. If, however, we were to determine that a finding of probable cause requires a ninety-six hour hold under § 17a-101g (c), instead of leaving the choice of a remedy to the commissioner's discretion, the commissioner would not have the option of petitioning the court for a hearing or for an ex parte order under § 46b-129 (b) until after a ninety-six hour hold had been invoked. Significantly, there is no language suggesting that § 46b-129 applies solely to children who are in the commissioner's custody pursuant to § 17a-101g (c). Accordingly, the only logical construction of the statutory scheme is to view the finding of probable cause as a threshold determination that permits the commissioner to choose among these and other available remedies to ensure the child's safety.[10]

Our interpretation of § 17a-101g (c) avoids the unwise result of requiring the commissioner to seek a ninety-six hour hold in situations where immediate removal is necessary but sufficient time exists to file a petition for an order of temporary custody with the court. See *State* v. *Sandoval*, 263 Conn. 524, 553, 821 A.2d 247 (2003) ("we interpret statutes to avoid bizarre or nonsensical results" [internal quotation marks omitted]); see also *Tenenbaum* v. *Williams*, 193 F.3d 581, 596 (2d Cir. 1999) ("it is unconstitutional for state officials to effect a child's removal on an emergency basis where there is reasonable time safely to obtain judicial authorization consistent with the child's safety" [internal quotation marks omitted]). This construction of the statute

---

child, it presumably would have used different language in each of those statutes to describe the necessity for removal. Instead, both statutes use identical language in providing that, as part of the probable cause determination, it must be found that "immediate removal . . . is necessary to ensure the child's safety . . . ." General Statutes §§ 17a-101g (c) and 46b-129 (b).

[10] For example, the commissioner may choose to seek a temporary restraining order to prevent the offender from having contact with the child. See Department of Children and Families, Policy Manual, Vol. II, § 34-10-2, p. 1.

also protects children from the unnecessary disruption that will result if a ninety-six hour hold is imposed in cases where the commissioner's principal objective is an order of temporary custody, but the court subsequently determines that such an order is unwarranted. To ensure a coherent construction of the statutory scheme; see *Secretary of the Office of Policy and Management* v. *Employees' Review Board*, supra, 267 Conn. 278; we therefore conclude that § 17a-101g (c) is directory rather than mandatory and does not require the commissioner to invoke a ninety-six hour hold, but grants the commissioner discretion to choose the most appropriate remedy in any given case.

We further conclude that, even if the commissioner determines that probable cause exists and that removal is necessary pursuant to § 17a-101g (c), the authorized employee or law enforcement officer is not statutorily required to remove the child. Section 17a-101-13 of the Regulations of Connecticut State Agencies describes the procedures that apply when the commissioner authorizes removal under a ninety-six hour hold. "Administrative rules and regulations are given the force and effect of law." *Hartford Electric Light Co.* v. *Sullivan*, 161 Conn. 145, 154, 285 A.2d 352 (1971). "We therefore construe agency regulations in accordance with accepted rules of statutory construction." *Gianetti* v. *Norwalk Hospital*, 211 Conn. 51, 60, 557 A.2d 1249 (1989).

Subsection (b) of the regulation is entitled "[p]rocedures prior to removal" and provides in relevant part that, "[p]rior to the immediate removal of a child the authorized . . . employee shall (1) investigate the situation and evaluate it . . . (2) determine if the child or family is listed in the Child Abuse and Neglect Registry . . . [and] (3) obtain [the commissioner's] approval . . . ." See Regs., Conn. State Agencies § 17a-101-13 (b). Thereafter, subsection (c) of the regulation, entitled

"[p]rocedures upon removal," provides in relevant part that, "[i]f the [commissioner] or his designee authorizes the employee to remove the child . . . *and the employee determines that immediate removal is required*," the employee shall notify the parent or guardian, cooperate with and accompany the designated law enforcement officer authorized to remove the child and place the child with another caretaker. (Emphasis added.) Regs., Conn. State Agencies § 17a-101-13 (c). Subsection (c) of the regulation thus contemplates a second discretionary determination, to be made by the authorized employee, that the conditions justifying the commissioner's original decision to remove the child remain unchanged and that removal should proceed.[11] The clear implication is that the commissioner's original decision may be revoked if conditions improve in the child's surroundings in the hours following the commissioner's approval but before the scheduled removal. That conditions may improve, even in a very brief time, is specifically recognized in subsection (d) of the statute, which grants the commissioner discretion to return a child after ninety-six hours, with or without protective services. See General Statutes § 17a-

---

[11] We note that § 17a-101-13 (c) of the regulations, which became effective April 25, 1984, and has not been amended substantively since that date, contains language that is inconsistent with the statute as presently written, in that the regulation provides that the commissioner "may authorize" any department employee or law enforcement officer to remove a child when the prescribed conditions are met, whereas the present version of the statute provides that the commissioner "shall authorize" any department employee or law enforcement officer to remove a child when the prescribed conditions are met. See General Statutes § 17a-101g (c). This inconsistency is very likely due to the fact that the statute, prior to its amendment in 1996; see Public Acts 1996, No. 96-246, § 9; provided that the commissioner "may authorize" the child's removal and the regulation was never modified to reflect that the phrase was changed in the amended statute to "shall authorize." The inconsistency, however, does not affect our interpretation of the regulation insofar as it pertains to the authorized employee's subsequent determination that conditions continue to warrant immediate removal of the child by means of a ninety-six hour hold.

101g (d). Consequently, a review of department regulations and policies supports our conclusion that § 17a-101g (c) does not impose a mandatory duty on the commissioner or the authorized employee or law enforcement officer to cause removal of a child under a ninety-six hour hold if the commissioner believes that probable cause exists.

Removal of a child from the family is such a drastic step that it makes sense for the commissioner or the authorized employee to retain discretion with respect to the child's removal. The department policy manual advises that "immediate removal of a child [by way of a ninety-six hour hold] shall be initiated *only* as a last resort when Superior Court intervention is not possible" and that "all less drastic procedures for intervention to secure the safety of the child shall be explored before considering immediate removal . . . ." (Emphasis in original.) Department of Children and Families, Policy Manual, Vol. II, § 34-10-4, p. 2. Alternatives to removal that may accomplish the same objective include placing the child with a relative or in a temporary shelter, taking the child to a medical facility, removing the abusive parent or guardian from the child's home, obtaining a temporary restraining order to prevent the offender from having contact with the child and allowing a responsible adult into the home to protect the child. Id., § 34-10-2, p. 1. Indeed, a less draconian response may be advisable at the time of removal because the level of "danger" or "risk" to the child, which the department policy manual describes as the first factor to be considered when contemplating removal; id., § 34-10-3, p. 2 and § 34-10-4, p. 1; may change quickly depending on the type of risk to which the child is exposed.

To illustrate, the department policy manual sets forth the following criteria for determining whether a child is in an unsafe environment: (1) abandonment or inadequate supervision; (2) a dangerous, inadequate or sexu-

ally assaultive parent or guardian; and (3) a parent or guardian who refuses to remove the child from dangerous physical surroundings. Id., § 34-10-4, pp. 3–4. If a probable cause determination is based on information that a family member sexually assaulted the child and the authorized employee subsequently learns that the perpetrator no longer has access to the home, the employee may conclude that removal is no longer required.

The Court of Appeals observed that the statutory provisions concerning child protection "invest significant discretion in the [department] to determine both whether an investigation is warranted and what remedial action, if any, to pursue based on the results of the investigation." Sealed v. Sealed, supra, 332 F.3d 57. Remedial actions are guided by relevant public policy considerations. General Statutes § 17a-101 (a) describes Connecticut's child protection policy as follows: "The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family."

The statement of public policy in § 17a-101 thus establishes that an important goal of the child protection statutes, in addition to protecting children from abuse and neglect, is to preserve family integrity by allowing children to remain with their parents and by teaching parents the skills they need to nurture and care for their children. In situations involving unstable families, maximum flexibility is required on the part of department officials and employees investigating reports of

abuse to ensure that the competing policy considerations of child protection and family integrity are properly balanced when devising a response in each particular case. Indeed, few other decisions require the weighing and balancing of so many complicated factors as removal of a child from the home. To construe § 17a-101g (c) as permitting the commissioner to exercise discretion when responding to a report of abuse is therefore consistent with the public policy of our state.

The plaintiffs cite *Comptroller* v. *Nelson*, 345 Md. 706, 694 A.2d 468 (1997), and *Gun South, Inc.* v. *Brady*, 711 F. Sup. 1054, 1063 (N.D. Ala.), rev'd on other grounds, 877 F.2d 858 (11th Cir. 1989), to support their claim that the meaning of the phrase "shall authorize" is plain and unambiguous.[12] These cases provide us with no meaningful guidance because the present issue must be decided in the context of Connecticut's child protection scheme and neither case arose in Connecticut or involved child welfare statutes.[13]

---

[12] The plaintiffs also cite several cases from other jurisdictions in which courts have found that state social services agencies have a statutory duty to assist abused children. See, e.g., *Mammo* v. *State*, 138 Ariz. 528, 530–32, 675 P.2d 1347 (Ariz. App. 1983) (agency subject to liability for failure to protect child murdered by boyfriend of custodial spouse following unheeded complaint of abuse because statute specifically described social worker's duties with regard to protection of threatened children); *Turner* v. *District of Columbia*, 532 A.2d 662, 675 (D.C. App. 1987) (agency breach of statutory duty to protect children actionable where social services agency was notified repeatedly of father's abuse and neglect of children); *Sabia* v. *State*, 164 Vt. 293, 296–97, 669 A.2d 1187 (1995) (state not immune from suit when state social workers neglected statutory duty to provide assistance to children seeking protection from sexual abuse). The issue in this case, however, is distinguishable because the certified question before this court is limited to whether the commissioner has a mandatory duty under § 17a-101g (c) to remove a child upon a finding of probable cause. Consequently, the present issue is far narrower in scope.

[13] In *Comptroller* v. *Nelson*, supra, 345 Md. 715, the Maryland Supreme Court held that a state agency was not entitled to deny its employees reclassifications based on fiscal difficulties. In examining the applicable statutory provision, the court determined that the phrase "shall authorize" was not ambiguous: "If the General Assembly appropriates the necessary funds, the Comptroller shall authorize payment of all outstanding awards.

The plaintiffs also argue that § 17a-101g (c) mandates removal upon a finding of probable cause because the department policy manual states that "examples of physical harm which *require* removal of the child are serious physical illness, serious physical injury [and] dangerous surroundings." (Emphasis added.) Department of Children and Families Policy Manual, supra, § 34-10-4, p. 2. "[I]t is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement." *Webster Bank* v. *Oakley*, 265 Conn. 539, 561, 830 A.2d 139 (2003), cert. denied, 541 U.S. 903, 124 S. Ct. 1603, 158 L. Ed. 2d 244 (2004). We do not agree, however, that the legislature intended the language of the statute to be read so narrowly.

A policy manual provision that is inconsistent with a state statute or regulation regarding the same subject matter shall not govern interpretation of that statute or regulation. See *Harrison* v. *Commissioner*, 204 Conn. 672, 680–81, 529 A.2d 188 (1987). In the present case, the plaintiffs overlook the department regulation providing for the authorized employee to make a determination following the commissioner's approval that immediate removal of the child is necessary. See Regs., Conn. State Agencies § 17a-101-13 (c). Accordingly, the use of the word "require" in § 34-10-4 of the department policy manual, insofar as it is construed to mandate immediate removal of the child, is inconsistent with the department regulations and does not govern our interpretation of the statute.

The statutory procedure is couched in mandatory language." (Internal quotation marks omitted.) Id., 716. In *Gun South, Inc.* v. *Brady*, supra, 711 F. Sup. 1063, a federal district court considered the meaning of the phrase "shall authorize" in the context of a federal statute that required the Secretary of the Treasury to permit the importation of firearms. The District Court concluded: "The statute notably does not contain the word 'may.' It uses the mandatory 'shall.' " Id.

We likewise disagree with the plaintiffs' contention that, once the commissioner has determined that probable cause exists, removal becomes a ministerial act. A ministerial act is "performed in a prescribed manner without the exercise of judgment or discretion as to the propriety of the action." (Internal quotation marks omitted.) *Lombard* v. *Edward J. Peters, Jr., P.C.*, supra, 252 Conn. 628. As previously noted, the department regulations provide for the authorized employee to make a determination that conditions in the child's surroundings continue to warrant the child's removal. Consequently, removal of the child pursuant to the statute is not a ministerial act on the part of the authorized employee or law enforcement officer. See Regs., Conn. State Agencies § 17a-101-13 (c).

The plaintiffs further argue that the legislative history of § 17a-101g (c) demonstrates the legislature's desire to strengthen the child protection scheme. They contend that comments made during the legislative debate indicate the legislature's intent that children at serious risk of abuse or neglect promptly be removed from their homes. The plaintiffs assert that the legislature clarified this intent in 1996 when it repealed General Statutes (Rev. to 1995) § 17a-101 (e) and recodified the removal provision at § 17a-101g (c); see Public Acts 1996, No. 96-246, § 9; because the phrase "may authorize" was changed to "shall authorize" and one of the conditions warranting immediate removal was changed from "immediate physical danger" to "imminent risk of physical harm." The plaintiffs thus argue that the legislative debate and the changes in the statutory language evince a legislative intent to impose a mandatory duty on the commissioner. We are not persuaded.

There was no discussion during the legislative debate regarding proposed changes to the language of § 17a-101g (c) because the changes were included in a highly publicized bill concerning the termination of parental

rights and were not a focus of the debate. See Public Acts 1996, No. 96-246, § 9; 39 H.R. Proc., Pt. 14, 1996 Sess., pp. 4969–5058; S. Proc., Pt. 6, 1996 Sess., pp. 1925–46. Moreover, legislators who spoke of the need to protect children at risk of harm also spoke of the need to provide parents with the skills required to keep their families intact. In just one example, Representative Ellen Scalettar observed: "There have been many cases of child abuse that have received high publicity in the last year and it has brought our attention to the problem of child abuse and how to protect children who are at risk of abuse and neglect.

"In working on the bill . . . we also realized that it's very important to balance our interest in protecting those children with the interest of parents to raise their children and to be free from unwarranted government intrusion. And it is the effort to draw that line properly that has . . . led to the draft that is before us." 39 H.R. Proc., supra, pp. 4979–80.

Furthermore, under the rules of statutory construction, although we recognize that "words and phrases shall be construed according to the commonly approved usage of the language"; General Statutes § 1-1 (a); the change in the statutory language from "may authorize" to "shall authorize" does not necessarily reflect the legislature's intent to mandate removal because, depending on the context, the word "shall" has been construed as directory; see State v. Pare, supra, 253 Conn. 623; and the word "may" has been construed as mandatory. See Capobinco v. Samorack, 102 Conn. 310, 313, 128 A. 648 (1925).

We consider the change in language from "immediate physical danger" to "imminent risk of physical harm" equally insignificant. See footnote 9 of this opinion.

Practice Book § 33a-8[14] provides for an order of tempo-
rary custody, and not for a ninety-six hour hold, in
life threatening medical situations. Thus, to construe
"imminent risk of physical harm" as a more urgent
threat than "immediate physical danger," and as requir-
ing a ninety-six hour hold on the theory that a ninety-
six hour hold is the most efficient response, would be
inconsistent with § 33a-8 of the Practice Book. Finally,
§ 17a-101g (a) grants the department thirty calendar
days within receipt of a report of abuse to complete
an investigation, even in urgent cases. Consequently,
the reference in § 17a-101g (c) to "imminent risk of
physical harm" should not be read to require a ninety-six
hour hold because we cannot presume that emergency
removal of the child by way of a temporary custody
order is any less efficient.

The plaintiffs also rely on the principles articulated
in *State* v. *Miranda*, 245 Conn. 209, 223, 715 A.2d 680
(1998), appeal after remand, 260 Conn. 93, 794 A.2d
506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L.
Ed. 2d 175 (2002), in which this court sustained the
conviction of the mother's live-in boyfriend for risk of
injury to a child and first degree assault on the ground
that he had knowledge that the mother had abused the
child. In *Miranda*, we stated that, as a matter of com-
mon law, "[i]n addition to biological and adoptive par-
ents and legal guardians, there may be other adults
who establish familial relationships with and assume
responsibility for the care of a child, thereby creating
a legal duty to protect that child from harm."[15] Id., 222–

---

[14] Practice Book § 33a-8 provides in relevant part: "When an emergency
medical situation exists which requires the *immediate* assumption of tempo-
rary custody of a child in order to save the child's life, the application for
a temporary custody order shall be filed together with a neglect or uncared
for petition. . . . The judicial authority may grant the temporary custody
order ex parte or may schedule an immediate hearing prior to issuing said
order. . . . " (Emphasis added.)

[15] On December 22, 2004, this court issued a slip opinion reversing the
defendant's convictions of assault in the first degree in violation of § 53a-

23. The plaintiffs thus suggest, on the basis of *Miranda,* that a state official specifically charged with protecting children from known abuse and neglect may have a common-law duty to invoke a ninety-six hour hold when a child is in imminent risk of harm.

We recognize that extratextual sources, including common-law principles governing the same subject matter, may guide this court in determining the meaning of a statute. See *State* v. *Lutters,* supra, 270 Conn. 205. The certified questions, however, do not ask us to determine whether the commissioner has a statutory or common-law duty to protect a child from reported abuse or neglect, but, rather, whether the commissioner or an authorized employee or law enforcement officer are required to remove a child from unsafe surroundings by way of a ninety-six hour hold upon a finding of probable cause. The question concerning the commissioner's duty to remove a child from unsafe surroundings is far narrower in scope than the question in *Miranda* concerning an adult's legal duty to protect a child from harm. Consequently, the common-law principles discussed in *Miranda* do not inform our resolution of the two certified questions.[16]

For the foregoing reasons, we conclude that § 17a-101g (c) does not mandate a defined administrative outcome when the commissioner has probable cause to believe that a child is in imminent risk of physical harm and that immediate removal is necessary. To the

59 (a) (3) for reasons to be set forth in a full opinion. See *State* v. *Miranda,* 272 Conn. 430, 864 A.2d 1 (2005).

[16] We also decline to address the plaintiffs' argument that under Vermont law there is a common-law right of action when a state actor specifically charged with providing assistance to a child fails to provide such assistance; see *Sabia* v. *State,* 164 Vt. 293, 669 A.2d 1187 (1985); and the related argument that there is a substantive due process right to child protection under the constitution of Connecticut, because the Court of Appeals granted the plaintiffs' petition to appeal from the District Court's order only as to the plaintiffs' procedural due process claims.

contrary, the Connecticut child protection statutes and corresponding regulations and policies provide the commissioner and his authorized employees with numerous options to protect a child, including removal under a ninety-six hour hold; General Statutes § 17a-101g (c); filing a petition with the court for a hearing or an ex parte order of temporary custody; General Statutes § 46b-129 (b); obtaining a temporary restraining order to prevent the offender from having access to the child; Department of Children and Families, Policy Manual, supra, § 34-10-2, p. 1; or arranging for a responsible adult to enter the home to ensure the child's safety. Id.

Accordingly, the answer to the first certified question is: No. Section 17a-101g (c) did not require the commissioner to cause the plaintiffs' removal upon a finding of probable cause, but merely authorized the commissioner to seek emergency removal based on his or her discretionary judgment.

The answer to the second certified question likewise is: No. Even if the commissioner had authorized removal of the plaintiffs pursuant to § 17a-101g (c), the designated department employee or law enforcement officer was not statutorily required, but was merely authorized, to remove the plaintiffs from their home.

No costs shall be taxed in this court to either party.

In this opinion the other justices concurred.